UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                                    Case No. 1:19-cr-00610-JGK

            v.


AVIRAM AZARI,

                        Defendant.

---------------------------------------------------------------X


## SENTENCING MEMORANDUM OF AVIRAM AZARI


Barry Zone, Esq.
Moses & Singer LLP
*Attorneys for Aviram Azari*
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 514-7800
E-mail: bzone@mosessinger.com

5487082 019236.0101

## INTRODUCTION

For the past four years, defendant Aviram Azari ("Mr. Azari") has been incarcerated under utterly inhumane conditions at Metropolitan Correctional Center ("MCC") in Manhattan and Metropolitan Detention Center ("MDC") in Brooklyn. From being forgotten in a windowless cell for 58 hours until he was discovered collapsed on the floor; to being repeatedly deprived basic medical attention to the point where he now ████████████████████████ to being driven away from the hospital against a doctor's urging for medical intervention; to the Bureau of Prisons disobeying Court Orders requiring Mr. Azari to receive medical assistance, it is no exaggeration to say that Mr. Azari has been "left to die" in jail.

In addition to contracting and suffering from a debilitating medical condition while in jail, Mr. Azari has experienced conditions of confinement not seen in modern United States history due to the Covid-19 Pandemic. The details are stomach-churning. For nearly one year, Mr. Azari was on lockdown, confined to a mold-infested, windowless cell for 23+ hours per day without showers, hot meals, or the ability to exercise or socialize. Mr. Azari spent months on end with no communications with the outside world, including his three children, except through his lawyers. During much of this time, he was denied basic sanitary items and received expired boxed meals, which were eaten-through by rats. Mr. Azari, ████████████████████████████ ██████████████████████████████████, described that during this period of extended isolation, mental anguish, and physical sickness, he was humiliated, and in pain and agony.

Suffice it to say, the physical, emotional, and psychological breakdown of Mr. Azari during this time is unimaginable. It also took a toll on his loved ones, who feared the worst for Mr. Azari while news reports described deadly outbreaks in New York-area prisons and Mr. Azari was unable to communicate due to lockdowns. As Mr. Azari's sister writes, "we've been living in the

fog for three years, not knowing the conditions under which he is being held, when he will be released and his medical state." Exhibit D, Ltr. from Lotem Vinter.

Of course, against this backdrop, there is no question that Mr. Azari pled guilty to a serious and sophisticated crime and must face a sentence that reflects the seriousness of that crime and has a deterrent effect on the public, among other considerations. The United States Probation Office for the Southern District of New York, in its Presentence Investigation Report (the "PSR"), calculated Mr. Azari's total adjusted Guidelines Offense Level as 29; his Criminal History Category as I; and his Guidelines imprisonment range as 87 to 108 months. However, for the reasons set forth herein, we respectfully submit that any more than 60 months' incarceration would be far "greater than necessary" to satisfy the factors of 18 U.S.C. § 3553(a). Mr. Azari has already, since his arrest over four years ago, endured a simply unimaginable punishment. While one cannot argue that this has been a "just punishment," as that term is used in 18 U.S.C. § 3553(a), equally one cannot argue that any *additional* term of incarceration beyond 60 months would make his punishment more "just." Mr. Azari has paid a debt to society that few can comprehend. Thus, based on the factors enumerated herein, we submit that a sentence of 60 months' imprisonment would be sufficient to satisfy the factors of 18 U.S.C. § 3553(a).

## DISCUSSION

### I.    Federal Sentencing Guidelines.

#### 1.  An Overview of Sentencing Post-*Booker.*

Since 2005, district courts have had wide discretion to impose non-Guidelines sentences as long as they are reasonable. *See United States v. Booker*, 543 U.S. 220, 226-27 (2005). The Guidelines have become "effectively advisory," and are only "the starting point and the initial benchmark." *See, Gall v. United States*, 552 U.S. 38, 49, 62 (2007). Moreover, "the Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."

2

*See, Nelson v. United States*, 555 U.S. 350, 352 (2009); *see also United States v. Cavera*, 550 F.3d 180, 184 (2d Cir. 2008) (explaining that a district court must "conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense").

Therefore, although the Guidelines remain a factor, district courts must undertake an individualized assessment of each of the factors in 18 U.S.C. § 3553(a). Ultimately, the overarching goal of sentencing is to ensure that a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing under § 3553(a). *See* 18 U.S.C. § 3553(a).

   **2. The Sentencing Calculation of the Probation Office.**

In its PSR, the Probation Office found Mr. Azari's adjusted Guidelines Offense Level to be 29 based on the following calculation:

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. §§ 2B1.1(a)(1)) | 7 |
| Specific Offense Characteristics (Loss Value)<br>(U.S.S.G. § 2B1.1(b)(1)(J)) | +18 |
| Specific Offense Characteristics (Number of Victims)<br>(U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Specific Offense Characteristics (Sophisticated Means)<br>(U.S.S.G. § 2B1.1(b)(10)(B) and (C)) | +2 |
| Adjustment for Role in Offense (Manager or Supervisor)<br>(U.S.S.G. § 3B1.1(b)) | +3 |
| Timely Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1(a) and (b)) | -3 |
| **Total Adjusted Guidelines Offense Level** | **29** |

Exhibit N, Azari PSR

Pursuant to the PSR, Mr. Azari has a criminal history score of zero and thus falls under Criminal History Category I. Therefore, his advisory Guidelines sentencing range is 87 to 108

months' incarceration, with a mandatory minimum of 24 months' incarceration on Count 4 to run consecutively to any other sentence. To note, the Probation Office's calculated offense level of 29 differs from the offense level calculation of 31 reflected in the plea agreement. However, we believe that the two-level enhancement pursuant to U.S.S.G. 2B1.1(b)(11) referenced in the plea agreement is inapplicable under 2B1.6, Application Note #2 as referenced in the Probation Office's Pre-Sentence Report. Currently, no objections regarding the Probation Office's offense level calculation have been raised. Of course, the Court is not required to impose a sentence within the Guidelines, and indeed we submit that such would be highly inappropriate given the circumstances of Mr. Azari's pre-sentencing incarceration, among other factors.

### 3. Courts' Consideration of Conditions of Confinement

Pre-*Booker*, and long before COVID-19, the Second Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," because harsh conditions of confinement could be regarded as a mitigating factor pursuant to U.S.S.G. § 5K2.0. *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (*per curiam*). Accordingly, sentencing judges have based downward departures on findings of unduly harsh conditions of pre-trial confinement. *See, e.g., United States v. Francis*, 129 F.2d 612 (S.D.N.Y. 2001) (Patterson, J.) (departing one level because of harsh conditions of pre-trial confinement endured by illegal reentry defendant at Hudson County Correctional Center). Post-*Booker*, concerns that authorized departures from the sentencing guidelines when they were mandatory, may now justify non-guidelines sentences pursuant to 18 U.S.C. § 3553(a).

Notably, and again before COVID-19, Courts recognized that MCC, in particular, is severely limited in terms of social programs, personal development programs, exercise, physical training, and recreation. It was judicially recognized as unsanitary with virtually no opportunities

4

to be outdoors.  For example, in 2006, Judge Sweet recognized that MCC is "overcrowded, unsanitary, and lacks certain facilities," and is a jail that is "not designed for long term stays." *United States v. Behr*, 2006 WL 1586563 *5 (S.D.N.Y. 2006) (Sweet, J.) (imposing a sentence of time served to defendant with a Guidelines range of 37-46 months who had been housed at MCC for 29 months in 2004-2006; also recognizing that Judge Kimba Wood reduced an individual's sentence by one-third based simply on the harsh conditions at MCC during normal pre-pandemic times).

Additionally, since the onset of COVID-19, courts in this District have recognized that the onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences "harsher and more punitive than would otherwise have been the case." *United States v. Hatcher*, 18 Cr. 454 (KPF), ECF No. 333, at *8-9 (S.D.N.Y. April 19, 2021), *quoting United States v. Rodriguez*, No. 00 Cr. 761-2 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020); see also *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing."); *United States v. Lizardi*, 11-CR-1032, Doc. No. 2523 at *7 (S.D.N.Y. Oct. 9, 2020 ("A day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.") *United States v. Ciprian*, No. 11 Cr. 1032-74 (PAE), 2021 U.S. Dist. LEXIS 18698, at *8 (S.D.N.Y. Feb. 1, 2021) (same).

This is particularly true at MCC, where deficient COVID-19 screening and contact tracing, inadequate access to soap, cleaning supplies, and food, and deficient isolation and quarantine

procedures, made the jail a tinderbox for the disease and unduly oppressive place to live.  In sentencing the defendant in *United States v. Gonzales*, No. 18-CR.-669-13 (JPO), ECF No. 254 (S.D.N.Y. Apr. 22, 2021), for example, Judge Oetken stated, "I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served."  Accordingly, Judge Oetken found that "having served 24 months is equivalent to having served three years."  Notably, in *Gonzalez*, the defendant's guideline offense level was 27; his in criminal history category was II; and his guidelines range was 78 to 97 months' incarceration.  In consideration (in part) of the conditions of confinement at MCC, Judge Oetken gave the defendant a sentence of time served.  Similarly, in *Hatcher*, *supra*, Judge Failla went so far as to conclude that the prolonged deprivations of programming opportunities and mental and physical health services, when coupled with the extreme lockdown conditions created by the BOP's response to the pandemic, rose to the level of "extraordinary and compelling reasons" to justify the compassionate release of the defendant in that case. *See, Hatcher* at *11.  In *United States v. Pina*, No. CR. 18-CR-179 (JSR), 2020 WL 3545514 at *1 (S.D.N.Y. Jun. 29, 2020), Judge Rakoff granted defendant's motion for compassionate release recognizing that the defendant's "mental health [was] deteriorating because of lockdown procedures adopted to prevent the spread of COVID-19 . . ." In *Pina*, the lockdown procedures resulted in defendant's confinement to his cell for 22 hours every day seriously undermining his ability to cope with and his post-traumatic stress disorder. *Id*. at *2.

### 4.    The Conditions of Mr. Azari's Confinement Warrant a Significant Downward Variance

The conditions of Mr. Azari's confinement warrant a significant downward variance, at a minimum.  Mr. Azari was arrested over four years ago, on September 29, 2019.  He was moved to MCC on or about that date. █████████████████████████████

6

In the MCC infirmary, Mr. Azari was told that they cannot help him, and issued a report that he should be taken to the hospital. However, it would be another 18 months before Mr. Azari would visit a hospital.

In the interim, the COVID-19 virus spread across MCC. Mr. Azari was detained for every minute of the Covid-19 pandemic. Mr. Azari, along with all other prisoners, was placed in lockdown. For months on end, Mr. Azari was locked in his cell for days at a time. He lived in filth without showers, hot meals, or the ability to exercise or socialize with other inmates. There were periods where he was deprived of basic sanitary needs, deprived of a mattress or pillow, and made to eat expired food from rat-infested boxes. He would experience periods of extreme heat or cold, or extreme humidity, without the most basic protection from the elements. After over four months of this, beginning in June of 2020, Mr. Azari was permitted to leave his cell less than an hour per day at most, during which time he was periodically able to check-in with his family, exercise, bathe, and socialize. Because Mr. Azari's family was located in Israel, however, between the seven-hour time difference and the difficulties with international calls, his contact with them was sporadic and largely though letters and attorneys. In addition, for the majority of his incarceration, programming at the prison was halted or limited, extinguishing what few rehabilitative resources existed in the first place and leaving Mr. Azari in a state of near-total isolation.



[REDACTED]

In addition, the condition is embarrassing and has caused Mr. Azari to become a pariah within the prison. [REDACTED]

[REDACTED]

Due to the apparent indifference (if not hostility) of the Bureau of Prisons toward Mr. Azari's condition, Mr. Azari has had to chase and beg for medical treatment and a formal diagnosis. [REDACTED]

[REDACTED]

In April of 2022, at the request of undersigned counsel, the Court issued an Order directing the Government and the Bureau of Prisons to "provide a report on the defendant's medical condition by April 25, 2022." ECF No. 50. [REDACTED]

[REDACTED]

8

[REDACTED]

Nearly two months later, on July 6, 2022, [REDACTED]

[REDACTED] At this point, as indicated in Mr. Azari's letter, he was a pariah

in the jail [REDACTED] Thus, rather than simply allow Mr.

Azari to fast in his cell, Mr. Azari was transferred to a cold, isolated cell for the night. Thereafter, the guards purportedly "forgot" about him. He remained in that windowless cement cell, without food or adequate clothing, for over two days. He was discovered, collapsed on the floor, on July 8, 2022, 58 hours after he entered isolation. He was then revived, taken to the MDC infirmary, seen by a nurse, and taken back to his cell without having seen a doctor.

Later that month, without forewarning, Mr. Azari was taken back to the isolation cell, with tight cuffs on both his hands and legs, and told to fast. [REDACTED]

[REDACTED] Mr. Azari then returned to

MDC without any indication of when or if he would hear the results of the tests.

[REDACTED]

In other words, Mr. Azari was told, in the presence of the guards, that he needed immediate medical intervention, and that he needed to be seen by other doctors, but he was instead sent back to MDC.

Later in November,

, and his requests for further intervention were denied. Despite efforts by Mr. Azari's attorney to obtain a copy of the MRI, it has still not been made available to this day.

Based on the limited medical diagnostics since received by Mr. Azari, according to Dr. John Docherty, physician and Adjunct Professor of Psychiatry at the esteemed Weill Cornell Medicine, he appears to be suffering from

The totality of his experience at MCC and MDC, from lockdown, to COVID-19, to Mr.

Azari's deteriorating health in the face of indifference by the BOP, to Mr. Azari being ostracized as a "leper" within the prison (including by the guards there to protect him), has been nothing short of torturous. As set forth above, these inhumane conditions should weigh heavily on the Court's determination that a sentence of 60 months' incarceration is "sufficient but not greater than necessary" to satisfy the directives of 18 U.S.C § 3553.

## II.     Application of 18 U.S.C § 3553(a).

In order to develop a sentence that is "sufficient, but not greater than necessary," the Court weighs the factors from 18 U.S.C. § 3553(a), including, *inter alia*, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment; afford adequate deterrence; protect the public from further crimes of the defendant; and provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense. We respectfully submit that a weighing of these factors strongly encourages a sentence of 60 months' incarceration.

### 1.  The History & Characteristics of Mr. Azari.

Mr. Azari was born on August 16, 1971 in Haifa, Israel. He enjoyed a supportive upbringing with his parents, Arye Azari and Pnina Azizi, and two younger sisters, Liha Azari and Lotem Azari. He met his wife, Maggie (nee Zohar), while serving in the Israel Defense Forces (IDF) in 1990. They married in 1996. The Azaris have two daughters, Danielle Azari (age 24)

11

and Almog Azari (age 21), and a son, Ariel Azari (age 13). Mr. Azari describes his relationship with his entire family – parents, siblings, wife, and children – as "close-knit." As set forth below, Mr. Azari's friends and family, while making no excuses for his actions that led to his current incarceration, remain supportive of him and yearn for his return home to Israel, where he has lived a full life, much of it, as described below, dedicated to service and community.

### i. Mr. Azari's Military Service.

From a young age, Mr. Azari was interested in the military and service for the Israel Defense Forces (IDF). He graduated from Kyziney yam Michmoret, a military boarding high school for aspiring naval officers, with good but not outstanding grades, and proceeded to immediately enlisted in the IDF in 1989.

Mr. Azari was assigned as a paratrooper in the prestigious Parabrigade in the 890th Battalion. After three years of service as a paratrooper, during continuous conflict, he demobilized and became an undercover police officer for the Israeli National Police, while remaining active with the IDF as a reserve. As a reserve, Mr. Azari served the annual maximum allowable number of days, which ultimately numbered over 300 days total.

In June of 2006, while Mr. Azari was on reserve, the Second Lebanon War broke out. Mr. Azari and his wife Maggie were in the United States at the time and immediately flew back to Israel. Mr. Azari self-enlisted in the IDF (he was not called upon in his reserves capacity at the time given his age and employment status) and joined his unit on the front line. Mr. Azari's battalion fought in Lebanese territory for a number of weeks, engaging with enemy soldiers and experiencing a number of close encounters under fire. On the last day of the War, just before an armistice was declared, a tank near Mr. Azari was hit by a Cornet anti-tank missile. This is how Yotam Dagan, a clinical and military psychologist and Director of NATAL, Israel's leading PTSD

12

prevention and treatment organization, describes what happened next:

> The paratroopers were near the tank when it exploded. They reached it, opened it up and cleared 3 dead bodies from the scorched tank. One of the crew members was still alive but trapped inside. Aviram worked frantically to try and save him.

Exhibit B, Mr. Dagan's Report

Similarly, here is how Mr. Azari's battalion commander and longtime friend, LTC Joseph

Berger, who was on the front line with him, describes the situation:

> Azari was on watch when the tank was hit. We were stationed on a hill, in a plantation. An anti-tank missile attack started. We both saw the tank explode. We started moving in the tank's direction. Azari could have stayed behind. He chose to join me. Three bodies and one wounded soldier who we worked hard to evacuate from the tank. Indescribable and staggering sights of mutilated bodies after the missile hit. It was awful. Soldiers were crying and shouting. It was bad. One of my men, a good friend of Azari, was intoxicated from fumes and poisonous gas that he inhaled inside the burnt tank. He lost consciousness and received full CPR and luckily survived. The wounded were evacuated by a helicopter that landed under heavy missile fire. That was both traumatic and a complicated event to manage. After this event, we continued fighting, and then marched up a very steep slope and a long distance to the border, back to Israel, with full (and heavy) combat gear.

Exhibit B, Mr. Dagan's Report

During the hostilities, Mr. Azari was also marginally hit in the hip by an enemy bullet, a

open wound he never treated medically.   As set forth below, these experiences had a profound

impact on Mr. Azari's future mental wellbeing as he assimilated from soldier, to police officer, to

combat soldier, and back again. In his letter to the Court, Mr. Azari's battalion commander writes

that during the Second Lebanon War, Mr. Azari "demonstrat[ed] exemplary performance in

difficult situations and under fire" and after the war, "helped greatly in supporting and

accompanying [the] bereaved families." Exhibit K, Ltr. from Joseph Berger. In short, as described

below, the experiences during the Second Lebanon War never left him.

> **ii.**   ███████████████████████

Mr. Azari's military service, which continued until he turned 40 years old, has been the

singular formative experience of his life, in both positive and negative ways. For example, following active duty, Mr. Azari continued the "soldier" lifestyle as an undercover police officer. In that capacity, Mr. Azari was recognized and honored for his participation in the apprehension and conviction of targets in a criminal prosecution, and also physically injured in a clash with a target whom he subdued into custody. Later, he obtained a private detective license form the Israeli DOJ and founded his company, Aviram Hawk, which is the private intelligence agency at the center of this case. In all facets of his adult life, from paratrooper, to undercover police officer, to combat soldier, to private intelligence agent, Mr. Azari demonstrated a high risk tolerance and commitment to protect and defend those he serves or who are in need of his assistance. As described in the reports of Yotam Dagan and Dr. John Docherty,

In particular, Yotam Dagan describes at length the impact Mr. Azari's military experiences, and particularly the tank incident described above, have had on him. As described in Mr. Dagan's report, which is based on his conversations with Maggie and others:

> According to Maggie, Azari's wife, he came back from the war and shared the tank story. Ever since, "he has changed" she says. He talks about the army all the time, reads military books and has an obsession regarding the military. This started after the 2006 war.



> Azari's affect tends to be optimistic in a unique, almost detached way. It seems that he is in complete denial of challenging situations. No temper tantrums. Even when

14

people let him down in business, he still gives additional chances. While being a detective, (naturally suspecting everything and everyone) he still holds a positive view of life and of people.

Exhibit B, Mr. Dagan's Report

Mr. Dagan also describes that ██████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ In his business – he is always

thinking about the next phase. A complete workaholic." Exhibit D, Mr. Dagan's Report.

Mr. Dagan believes that Mr. Azari has ████████████████████████

█████████████████████████████████████████████████████████████

He has survived a near-death experience in war and has witnessed the death of others close to him; ███████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████ Nevertheless, Azari shows continual professional functioning. He has turned ██████████████████ into an inner engine that has pushed him to work relentlessly while being on edge and pushing the limits to operate in the 'gray areas', on the slippery slope that has led him to the current state of affairs. ████████ tends to affect the way people perceive the world. In many cases, trust, goodness, and fairness are breached. In Azari's case – it seems that a mixture of "people are good and trustworthy (even after they prove otherwise); I have nothing to lose, and what could possibly happen to me?" ████████████████████████

████████████████████████████████████

Exhibit B, Mr. Dagan's Report

In a similar vein, Dr. Docherty describes Mr. Azari's ████████████████ as

aggravated by the conditions of his confinement. This is how he describes Mr. Azari's mental

health in the context of his confinement:

---

1 It should be noted that Mr. Dagan was not able to interview Mr. Azari in person due to pandemic-related restrictions and travel arrangements.

5487082 019236.0101



Exhibit C, Dr. Docherty's Report

Dr. Docherty's report goes on to describe the unending and cruel saga Mr. Azari has

endured in seeking basic medical assistance, and notes in particular the ostracization he has faced

within the jail due to ██████████████████████████████████████████████:

> These symptoms as well as one notable other symptom have had destructive effects
> on Mr. Azari's social life. ████████████████████████████████████████████
> ████████████████████████████
> ████████████████. This makes it very difficult to be with the other
> inmates. It has a particularly negative effect on his bunkmates who are kept awake
> themselves at night with the ███████████████████████████████████████
> ███████████████████████ Some have become angry and aggressive. Mr. Azari
> has tried to minimize the disruption by sleeping with a pillow over his mouth but
> that has had limited effect. Within the prison he is referred to, not by his name, but
> as ████████████████ He is passively ostracized and feels deeply humiliated. In all,
> Mr. Azari is not the man he once was, and his wife, who had been his steady
> support, indicated that she wanted a divorce. Mr. Azari's wife recently relented but
> this threat of divorce is now present in Mr. Azari's mind.

Exhibit C, Dr. Docherty's Report

To be clear, neither ████████████████████████████████████████, is an excuse for Mr.

Azari's crimes, and it would be a disservice to law-abiding individuals who suffer from ████████

████████████████████ to suggest otherwise. However, and while it is impossible to gauge the

full extent of the circumstances of Mr. Azari's ████ and how it shaped his actions, it is undeniable

that such circumstances negatively impacted his psychological state and played a role in this

particular crime. Mr. Azari has spent the better part of the past two decades in a state of heightened

16

███████████████ which have led him to make poor decisions. Of course, no detail or opinion

excuses the fact that Mr. Azari committed a serious crime. However, the compelling facts that

assist in understanding the explanation for his conduct are essential to this process. As such, we

bring this information to the Court by way of explanation – not excuse – to impress upon the Court

the context in which Mr. Azari committed the offense. As the Court considers a sentence that is

sufficient, but not greater than necessary, we respectfully ask the Court to consider Mr. Azari's

███████████████████████████████████████████████████████████

███████████████ in favor of a below-Guidelines sentence of 60 months incarceration..

### iii.    Mr. Azari's Family Life

Behind Mr. Azari's rough exterior as a paratrooper, undercover police officer and combat

veteran, is Mr. Azari's family life. Mr. Azari's family, and particularly his daughters and son, has

always been a source of pride and joy. In his letter to the Court, Mr. Azari describes his

relationship with his children as follows:

> My eldest daughter Daniel, 24, is now an officer in the Israeli Army (IDF). We
> have a very special relationship. We used to have meaningful conversations when
> she was home, and she would confide in me and ask for my opinion on many issues
> and decisions that she made during her life. I am so ashamed from her, and feel that
> I left a deep hole in her heart. I know that she supports me and I will definitely do
> my best to make things better when I return home. I was not present when my
> daughter Almog enlisted to the IDF for mandatory service. This is such a
> meaningful event – and I was not there for her. I love her so much. We are very
> close and I let her down. I can't wait to see her again and tell her how sorry I am
> for not being there for her entire army service. My son Ariel is such a sweet boy
> who always looked up to me. He was so disappointed when I couldn't be at his Bar
> Mitzva. When I think of how embarrassed he must have been explaining to his
> friends why I am not there – I literally start to cry. I can't wait to hug him again and
> make up for all the time I was away.

Exhibit A, Ltr. from Aviram Azari.

Despite a "workaholic" schedule and significant time spent in the IDF reserves, Mr. Azari

prioritized being there for his wife and children. His younger daughter, Almog, age 21 and recently

17

discharged from the IDF, writes about her father as a big-hearted, colorful character who surprised her on trips to London and Poland. She writes about how much she missed speaking with him during her military service and has been writing to him on WhatsApp despite Mr. Azari not being able to read her messages in prison: "Although my father has not read what I have been writing to him for almost three or more years, this is my way of completing missing conversations I very much lack with him the connection, and the fact that he is not with me." Exhibit E, Ltr. from Almog Azari.

Mr. Azari's son, Ariel, is only 13 years old and did not submit a letter to the Court for that reason. Mr. Azari describes him as a "sweet boy who always looked up to [him]." Mr. Azari writes about how deeply he missed being there for Ariel's Bar Mitzvah this past year, a sentiment shared by Mr. Azari's family. Of course, Ariel's Bar Mitzvah was not the only seminal event that Mr. Azari missed over four years of imprisonment. Mr. Azari's older daughter, Danielle, age 24, is currently an officer in the IDF, where she was already serving at the time he was arrested. She writes about how, while Mr. Azari was incarcerated, her grandmother (Mr. Azari's mother-in-law) died in 2021. She writes "Grandma loved Dad so much, she really adored him. The positive attitude towards life, the optimism, and the desire to contribute and give to all those around him. She cared so much for him while he was not there, cared for his well-being and physical and mental health. I'm so sorry Grandma left us before she got to see dad reunite with the family." Exhibit F, Ltr. From Danielle Azari.

Similarly, Mr. Azari's wife, Maggie, whom Mr. Azari met in the Army, writes about how Mr. Azari stood by her at her father's funeral, six years ago, but was incarcerated during her mother's recent funeral:

> About two years ago my mother passed. I remember very clearly my father's
> funeral, about six years ago. I was heart-broken and in pain but Aviram was stood

by my side, supported me during my most difficult period in life and helped me get
through it all.

This time, I stood in front of my mother's grave, a woman who I loved and
appreciated so much, and my sadness was double. The fact that from that moment
on I was orphaned from both my parents, and how I felt so alone in the world. It is
true that I am beloved and have loving children, and in front of them I must be
strong and I must support them, especially after losing a beloved grandmother - but
who will be with me? On who's shoulder am I to cry on? To whom can I tell what
is on my heart? To be clear, that before Aviram, the father of my children and
husband, is a good friend, a true friend.

Exhibit G, Ltr. Maggie Azari.

Mr. Azari's daughters also reflect, in their letters, about how Mr. Azari missed out on

seminal moments in their military service. Almog writes:

It's important for me to say and share that the issue of mandatory army service has
always been a Friday meal conversation. As a child my dad would always share
experiences from his service and what he went through as a fighter. At the end of
the conversation, he would always ask what you were thinking to do when you
enlist. [. . .]

The day of my enlistment had come, and may I say how difficult it was for me to
see the other soldiers accompanying their parents and families. I, on the other hand,
accompanied by my mother, brother and friend. My older sister was in the army
and could not be released. The hardest part about the army was my father, how he
was not by my side, and how he couldn't send me off to the army.

Exhibit E, Ltr. from Almog Azari.

Notably, Mr. Azari was taking Almog and her brother on a pre-enlistment trip to

Disneyland at the time he was arrested at JFK airport. Similarly, his older daughter, Danielle, who

has been promoted from the rank of Logistics Officer to Lieutenant Colonel to Major while Mr.

Azari has been incarcerated, writes that "I went through hard experiences during my military

service, and the service looked completely different on the days when my dad was home compared

to the days when he was no longer." Exhibit F, Ltr. from Danielle Azari.

As demonstrated in the letters from his family, Mr. Azari shares a deep and unwavering

relationship with his loved ones. While the last four years have been tremendously trying on Mr. Azari's family, and particularly his relationship with his wife who was oblivious to the facts underlying the charges, they nevertheless have continued to support him during this difficult and humbling time. As acknowledged by Mr. Azari in his letter to the Court, "I thank God that my family supports me."

Admittedly, the image of Mr. Azari as a big-hearted, loving father and husband stands in stark contrast with Mr. Azar's role and participation in this offense. There is no rectifying this dichotomy, except to acknowledge that Mr. Azari is both of these things. In requesting a below-Guidelines sentence of 60 months' incarceration, we humbly ask the Court to consider Mr. Azari's best characteristics, as exemplified in the letters to the Court form his family, next to those condemnable characteristics that placed him before this Court to be sentenced.

### vi.    Mr. Azari's Life of Service to his Community

Just as it may be hard to describe Mr. Azari as the big-hearted father as he has accepted responsibility for the crimes in this case, so too is it difficult to describe Mr. Azari as a devoted member of his community. Yet, Mr. Azari is deserving of that label.

For example, Mr. Azari's friend, Moran, writes about how Mr. Azari stood by her and her husband as her husband, Sagiv, passed away from cancer.

> When Sagiv fell ill at age 47 you were always by his side. You suggested him to go get cancer treatment in the United States, reinforcing him with stories of recovery from the terrible disease by telling him stories from your childhood and adolescence. When Sagiv 's condition declined, you supported us and the children. You would quietly wait under our house to take the kids to school, you always asked if I needed anything, you asked to come sit next to Sagiv just to see him sleep and be by his side when he woke up.
>
> Sagiv had the pleasure of a true, loyal, and supportive friend. You were attentive to problem solving, you advised him when he started his business, and you were always so attentive and available to him. Your close relationship made people think that you were twin brothers: you both have blue eyes, a full and bright face, and a

belly that shows your love of food and flavors.

When the moment arrives, when you get home and walk in the door, it will be as if half of Sagiv has come back.

Exhibit H, Ltr. from Moran.

Another friend with cancer, Daniel Schneider, writes about how Mr. Azari hired him during

his chemotherapy treatment as a website designer, at a time when he was unable to find work:

> I realize in retrospect that he did not really need that website and probably rarely used it. That site was an excuse to help me. It moves me to tears to think that while people, close and distant, good and busy could not find the strength to help me, Aviram who did not know me at the tie, did above and beyond not only to help me, but to help me feel needed and healthy, not needy. I know that much of this recovery is thanks to Aviram's kindheartedness and generosity."

> Since the opportunity given to me by Aviram, I started a successful independent business as a designer and worked with leading Israeli and international start-ups and technology companies.

Exhibit I, Ltr. from Daniel Schneider.

Mr. Azari's prior work history also demonstrates a devotion to country and community. In addition to serving his native Israel in the IDF, Mr. Azari worked as a policeman. A former colleague of Mr. Azari in the Israeli Police, Superintendent Jacov Sharvit, describes how, when Mr. Azari was a police officer, "Aviram was considered among the best professionals in the unit whose most prominent traits include determination, courage and seeking engagement [and] in addition, values of camaraderie and friendship were highest in his mind." Exhibit J, Ltr. from Jacov Sharvit.

Although, plainly, Mr. Azari's desire to serve his community took a backseat to profit during the commission of the instant offense, we ask the Court to consider Mr. Azari's commendable years of service to his country and community, as a counterbalance to those condemnable years during which he was involved in the commission of the instant offenses.

21

**b.**     **The Instant Offense: Mr. Azari's Acceptance of Responsibility**.

Despite the extreme punishment he has endured, as set forth above, Mr. Azari is remorseful for his actions and for the indiscriminate victims of his crime. He makes no excuses for the actions that brought him to jail and recognizes that his conduct is deserving of punishment. As he describes in his letter to the Court:

> I can't emphasize enough how sorry I am for what I have done. Unlawful hacking is a severe crime, and I never should have gotten involved in it. I accept and understand that for what I did I deserve to be punished.

Exhibit A, Ltr. from Aviram Azari.

It should be noted that Mr. Azari's business, Aviram Hawk, was founded in 2006 and was at first a lawful business which enabled Mr. Azari to utilize his undeniable skills developed as a soldier and police officer, for the benefit of private consumers. Mr. Azari was successful at growing his business. He should have stopped there. However, he resorted to illegal hacking and investigation tactics in an effort to enhance revenue and results for his clients. He saw that there was money to be made by including hacking in his menu of services. This was the worst decision of Mr. Azari's life. As he writes:

> I blame only myself for these years that I lost, and please believe me when I say that there is not a day that goes by that I don't regret doing what I did. Nothing justifies the illegal hacking that I regrettably chose to commit.

Exhibit A, Ltr. from Aviram Azari.

That Mr. Azari's illegal activities were packaged alongside legal private intelligence services is, of course, no excuse. Mr. Azari is the first person to say he is guilty.

We respectfully ask the Court to consider his unconditional acceptance of responsibility in sentencing Mr. Azari.

**c. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Avoid Unwarranted Sentence Disparities and Other Considerations Under 18 U.S.C. § 3553(a)(2-7).**

As the Court reflects upon the person being sentenced, we urge Your Honor to consider that today, after over four years of incarceration and MDC and MCC, a sentence of 60 months incarceration will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities.

### i. 60 Months Incarceration Would Not Result in a Sentencing Disparity

A sentence of 60 months' incarceration would not represent a disparity in sentencing, but would fall within the range of reasonable sentences. *See, e.g., United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (*en banc*) (explaining that a procedurally sound sentence will be affirmed "unless no reasonable sentencing court would have imposed the same sentence *on that particular defendant* for the reasons the district court provided") (emphasis added).

An evaluation of the Sentencing Commission's sourcebook is revealing in this regard. Of the 2,439 defendants sentenced in the Second Circuit in 2020, only 727 (29.8%) received a within-the-guidelines sentence, while 1,171 (48.0%) received a variant sentence. *See*, Exhibit L, Table 30. Of the 924 defendants sentenced in the Southern District of New York, only 168 (18.2%) received a within-the-guidelines sentence, while 566 (61.3%) received sentences below the guidelines minimum sentence based solely on Booker and the factors of 18 U.S.C. §3553(a). In 2021, meanwhile, in the Southern District of New York, only 19.8 % of sentenced defendants received a Guidelines sentence, while 66.6% received a downward variance based solely on *Booker* and the factors of 18 U.S.C. §3553(a). *See*, Exhibit M, Table 30. Although the Sentencing Commission's 2021 Sourcebook does not provide specific statistics related to computer hacking,

23

metrics provided for Fraud/Theft/Embezzlement are informative. Of those defendants nationwide who received a sentence that fell within the Guidelines, 73.1% of those sentenced for Fraud/Theft/Embezzlement offenses received a sentence in the lower half of the Guidelines range. *Id.* On the whole, 64.4% of all those convicted received a sentence in the lower half of the range. Accordingly, separate and apart from the conditions of Mr. Azari's presentencing confinement, a below Guidelines sentence of 60 months' incarceration would not result in a sentencing disparity.

### ii. *Mr. Azari's Conditions of Confinement Must be Taken Into Consideration*

As indicated in Section 1(c), *supra*, the conditions of pretrial confinement may be taken into consideration at sentencing. Here, in particular, the conditions of Mr. Azari's custody over the four years he spent at MCC and MDC must be a primary consideration as the Court contemplates what constitutes "just punishment" and a punishment that is "sufficient but not greater than necessary."

As noted above, Mr. Azari has been detained at MCC since shortly after arrest in September of 2019. The conditions of his confinement, described above, defy characterization and need not be repeated here. What is evident here, is that Mr. Azari has suffered extraordinary conditions of confinement during his four years of incarceration, making the time he has served "harsher and more punitive" than it otherwise would have been. The Guideline sentence range in this case calls for a minimum term of imprisonment of 87 months, with a mandatory minimum of 24 months to run consecutively, which totals 111 months. We, respectfully, submit that a sentence of 60 months, which represents approximately half of the minimum sentence is appropriate especially given Judge Oetken's assessment in *Gonzalez* that incarceration during the COVID-19 pandemic would be two times what would ordinarily be served.

24

### iii.    Mr. Azari's Sentence Provides Adequate Deterrence

Moreover, the requested sentence would provide adequate general and specific deterrence. It will demonstrate to the public that computer hacking, even on foreign shores, will not be tolerated, and will result in substantial consequences. In particular, a 60-month sentence will deter would-be hackers no matter how "anonymous" or "victimless" they believe their conduct to be. And, while one would hope that the extreme conditions of Mr. Azari's punishment does not become the norm for any term of incarceration, this particular punishment will send a message that the justice system did not take a pause for COVID-19.

The public does not need protection from Mr. Azari. The letters from his family, friends, and acquaintances, and the reports of Mr. Dagan and Dr. Docherty, demonstrate this. As well, Mr. Azari's own letter to the Court demonstrates that Mr. Azari is committed, for his sake and the sake of those around him, to healing and self-improvement. As Mr. Azari writes to this Court:

> I have always helped people. I helped friends, neighbors, family members and clients. I always had a good reputation, a reputation of someone who you can count on, someone to lean on. I shattered that reputation with my very own hands! I am going to work hard to restore that image of who I really am and I plan on doing everything possible to make things right again.

Exhibit A, Ltr. from Aviram Azari.

In fact, Mr. Azari has already participated in various coursework, worked as one of the head preparation cooks, and volunteered to sanitize the kitchen area and equipment during his time in jail all while suffering from his various maladies. *See*, Exhibit O, MDC Certificates and Letters.

Accordingly, based on Mr. Azari's acceptance of responsibility; the conditions of Mr. Azari's confinement; the medical conditions from which he suffers; and the other factors of 18 U.S.C. § 3553(a), we most respectfully request that this Court sentence Mr. Azari to a sentence of 60 months' incarceration, which is sufficient to meet the goals of sentencing.

## CONCLUSION

On behalf of Mr. Azari and his family, we thank the Court for taking the time to consider

our sentencing submission and look forward to addressing the Court during the sentencing hearing.

Dated:      New York, New York
            October __, 2023

                                     MOSES & SINGER, LLP
                                     *Attorneys for Defendant, Aviram Azari*

                                     By: /S/ Barry Zone
                                       Barry Zone
                                     The Chrysler Building
                                     405 Lexington Avenue
                                     New York, New York 10174
                                     Tel: (212) 554-7800

26

# Exhibit A

October 6 2023

Hon. John G. Koeltl

U.S Courthouse

500 Pearl Street

New York, New York 10007

Dear Judge Koeltl,

I am writing to you after being imprisoned for the past 4 years, hoping that I will be able to describe in this letter what I'm feeling at this time, and express what I have been through during my incarceration, first at the MCC and now at the MDC.

These past years surely made me understand what bad choices I have made. I went from being a good citizen who contributed to his society and country, to a criminal who is doing time in jail. I let down my family, my parents, my sisters, my wife and 2 daughters and I let down my son. I certainly let myself down. In my worst dreams I did not ever see myself as a criminal. I have always helped people. I helped friends, neighbors, family members and clients. I always had a good reputation, a reputation of someone who you can count on, someone to lean on. I shattered that reputation with my very own hands! I am going to work hard to restore that image of who I really am and I plan on doing everything possible to make things right again.

I can't emphasize enough how sorry I am for what I have done. Unlawful hacking is a severe crime, and I never should have gotten involved in it. I accept and understand that for what I did I deserve to be punished. I blame only myself for these years that I lost, and please believe me when I say that there is not a day that goes by that I don't regret doing what I did. Nothing justifies the illegal hacking that I regrettably chose to commit.

I'm aware that my counsel has described what I've been through during my detention, but I just, respectfully wanted to share with the Court, where I am, and have been for the past, more than 4 years.  My time at the MCC and MDC has been like nothing I ever imagined. About 4 months after being arrested I started getting ███████████████. I asked for medical help time and again but was denied every single time. A few months after that ████████████████████████████████████

████████████████

I cannot describe to you how degrading and humiliating it is to be ███████████████████████████
████████████████████████████████████████████████████ not only by

inmates, but also by the prison guards.

████████████████████████████████████████████. It's very hard for me to remember all the times that I begged to see a doctor and was denied. Even when I finally was taken to the hospital, things did not go right and many times the medical check-up was not received. The treatment of the guards who took me to the hospital, at times, was depraving. Once, when the doctor at the hospital said that I should wait in the hospital for a few hours fasting so the check-up can be done that day, the guards replied that they were told to bring me to him, and not to different doctor. I was taken back to the MDC without getting the check-up or treatment. I was very upset and deeply depressed. The head of the clinic mocked me and said that the world record of ███████████ was 12 years so I still have what to look forward to. I could not believe how a doctor could be so indifferent to my basic human rights. Another time I was put in solitary confinement to make sure that I fast before a medical check-up, but I was left there for about 58 hours, without food and without anything to

cover myself. My calls to the guards were ignored. I was cold and hungry until finally I was found on the floor after collapsing. Even after that, I was not taken to the hospital. This was mainly humiliating and also agonizing and painful. I accept that I should be punished, but no crime merits the treatment I received at the MCC and MDC.

We recently celebrated Yom Kippur, which gave me another opportunity to reflect on the wrong things I have done, and the pain that I have caused others. I wish that I could go back in time and make different choices. I wish there was a way that I can express how sorry I am to the people who I have hurt while committing these crimes.

I thank God that my family supports me. It hurts me to think about how much pain I caused them. I always had very good relationships with my wife and kids. We are a close-knit family who love and care about each other very much. Unfortunately, my wife is not in a good state. I always was a solid rock for her and she could always count on me. For the past 4+ years – I disappeared. She is depressed and weak, and I hope that I manage to build our relationship back to what it was.

My eldest daughter Daniel, 24, is now an officer in the Israeli Army (IDF). We have a very special relationship. We used to have meaningful conversations when she was home, and she would confide in me and ask for my opinion on many issues and decisions that she made during her life. I am so ashamed from her, and feel that I left a deep hole in her heart. I know that she supports me and I will definitely do my best to make things better when I return home.

I was not present when my daughter Almog enlisted to the IDF for mandatory service. This is such a meaningful event – and I was not there for her. I love her so much. We are very close and I let her down. I can't wait to see her again and tell her how sorry I am for not being there for her entire army service.

My son Ariel is such a sweet boy who always looked up to me. He was so disappointed when I couldn't be at his Bar Mitzva. When I think of how embarrassed he must have been explaining to his friends why I am not there – I literally start to cry. I can't wait to hug him again and make up for all the time I was away.

I know that my parents, who are very close to me and to my family, have suffered as much, maybe more, than anyone else. I can't think of the pain I have caused them without tearing up.

Judge Koeltl, I sincerely regret what I have done. I blame only myself for what I've been through these past 4 years, the humiliation and pain, and for the suffering I caused so many other people.

I know the Court is experienced and fair, so you will punish me as you believe appropriate. I only ask that you consider what I've been through for more than 4 years when making your decision, and I pray that you will have it in your heart to end my punishment as fast as possible.

Yours sincerely, Aviram Azari

# Exhibit B

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

US vs. Azrai                                                    May 20, 2023

### Expert witness report, Aviram Azrai, Israeli ID 028594778
Presented by Yotam Dagan, May 2023

**Qualifications:**
CDR (res.) Yotam Dagan

As a clinical and military psychologist, I have served as a naval special warfare combat soldier (Shyetet 13 - Israeli Navy SEALs), a SEAL team commander and as the chief instructor at the Israeli Navy SEALs BUDS training school. I later served as the Israeli Navy SEALs unit psychologist, bearing the responsibility of recruitment and training Navy SEALs, including stress inoculation training and mental preparedness towards high-risk missions beyond enemy lines and close-ranged guerilla warfare. Over the years, I have pivoted from leading my men into combat to building their combat capacity, developing their leadership skills, and focusing on their well-being. Over turbulent times of combat, in which we have lost some of our finest men, it was my responsibility to enhance the resilience of the combat teams and to provide therapeutic assistance to soldiers suffering PTSD. Subsequent to my military tenure, I initiated and founded not-for-profit programs dedicated to helping soldiers discharge, reintegrate and embrace leadership positions in public service and civil society. I served as a director in NATAL, Israel's leading post-traumatic stress prevention and treatment organization, and as head of its international team. In this capacity, I developed a resilience training model for first responders. This model – 'Operational Stress Management' has been designated as a gold standard by the US government FEMA and its Urban Area Security Initiative (UASI) in NJ and is widely deployed in Hospitals, fire departments, and police units. As an independent consultant to security organizations on issues of crisis management and counter-terrorism, I was instrumental in helping the Boston Police Department in the aftermath of the Boston Marathon bombing and was one of the first professionals called to the Parkland, FL, Marjory Stoneman Douglas High School after the mass shooting to assist teachers, counselors, and students in healing and overcoming.
I have worked in many major cities in the EU, Asia, and North America, including with the US Attorney in Portland OR on a Global Jihad case in 2015, and in recent years, I have served as an expert witness on issues of psychological trauma, counter-terrorism, and decision making under extreme stress.

During my last active duty position at the Israeli military intelligence Psy-Ops and Information Operations unit, I took part in ongoing data exchange and Intelligence - operational cooperation with leading US agencies, contributing my expertise in the fields of counter terrorism, tactical psychological profiling and behavioral assessment,

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

some of which have led to outstanding operational success in our joint combating of Global Jihad.

With those agencies and their Israeli counterparts, I have conducted strategic psychological profiling and behavioral analysis of numerous individuals that were of interest due to their involvement in anti-American and Israeli activities, espionage, and terrorism.

Over the last 6 years, I have taught psychological profiling at the University of Ariel's associate degree in criminal profiling. The course I give focuses on profiling Jihadist suicide terrorists.

Over the last two decades, I have presented and consulted on these issues to the FBI and other security and first response agencies in the US and Europe:

1. Presented at FBI HQ on issues of counter-terrorism in 2003.
2. Presented at BKA (German Federal criminal police) on issues of counter-terrorism in Berlin, 2005.
3. Was keynote speaker at the FBI and the Texas Association of hostage negotiators annual conference, in 2008.
4. Presented at the FBI Joint Counter-Terrorism Task Force in Salt Lake City, 2012.
5. Consulted the Office of military suicide prevention, US Department of Defense, 2012-2013.
6. Was head of a disaster relief mission to the Philippines in the aftermath of typhoon Yolanda 2014.
7. Conducted counter-terrorism and resilience training with the US Attorney at Portland, OR, in 2015.
8. Was a keynote speaker at the Firefighters without Borders and Greater Tucson AZ, fire foundation annual Conference 2016.
9. Presented the Operational Stress Management model – An innovative resilience training program for first responders at the International Association of Chiefs of Police, Orlando, FL, 2018.
10. Presented the Operational Stress Management model at the National Conference on EMS in Atlantic City, NJ, 2018
11. Presented the Operational Stress Management Model in the Global Summit on Counter-terrorism, at Reichman University, Herzliya, Israel, 2018.
12. Presented at a panel at the European Conference for victim support, "Which path to resilience?" Paris, 2018.
13. Presented the Operational Stress Management model at FBI HQ, Victim support unit, Washington DC, 2019.
14. Trained Operational Stress Management trainers in NJ with the UASI (Urban Area Security Initiative). This Program is funded by FEMA, the US government. 2018-2019

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

15. Trained crisis management teams in Chicago, Parkland FL, Berlin, Vienna, London, Manchester, Oslo, Goteborg, Tallinn, Lisbon, Rome, Athens, and Prague. 2016 - 2020

**Formal education:**

I earned a BA degree in psychology and general studies and a MA degree in clinical psychology at the University of Haifa, Israel, and became a certified clinical psychologist by the Israeli Ministry of Health. Upon being awarded the prestigious Wexner Israel fellowship, I completed a master's degree in public administration at the JFK School of Government at Harvard University.

**Expert witness report**

In November 2019, I was called by Mr. Azrai's defense team, to serve as an expert witness. I was asked to assess the defendant's psychological background, current emotional condition and to explore possible effects that his military service and his experience of combat might have had, on his behavior and decision-making, during events that are relevant to the case at hand. While my intent was to interview Mr. Azrai, in person, at the MCC detention facility in New York, this became impossible due to COVID-19-induced travel restrictions and the complete lock-down of inmates at MCC, and the strict restrictions on visitation rights that the defendant would be entitled to during regular circumstances  In the process, I have interviewed a number of individuals, including Mr. Azrai's wife; his military reserve commander and unit's deputy battalion commander; the IDF's (Israeli Defense Forces) Chief Reserve Officer – General Ari Singer and others. I have reviewed documented details of the 2006 Second Lebanon war events that Mr. Azrai took an active part in as a combat soldier. While it is always better to have an in-person impression and a chance to interview and analyze the defendant, it is often the case that this is not possible. In two major cases – US vs. Khan (2015, US attorney Portland OR) and the State of Israel vs. Haybatov (2009; 2018) my expert witness reports were given without meeting the subject of the report in person. In the first case, I served with the prosecution. A plea was achieved before I took the witness stand. In the second case, I served with the Israeli Ministry of Justice public defense. It was a high-profile murder case in which a conviction by the District Court was overruled by the Supreme Court, largely leaning on my expert opinion. The defendant was acquitted and released immediately.

**Disclaimer**

This report is given by me for submission as evidence in a court of law. I hereby declare that I am well aware, that with regard to the criminal law regarding false testimony in court, this report, as signed by me, is lawful as testimony in court.

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

**Mr. Azrai's Personal background**:
Aviram, born in 1971 in Israel, grew up in the larger Haifa Metropole. He graduated high school in Ktziney yam Michmoret – a boarding school for cadets aiming to become naval officers.

**Mandatory military service**:
In 1989 Azrai enlisted in the Israeli Defense Forces (IDF) as part of his mandatory service (Israel still has a draft). He volunteered to serve in the prestigious Para-brigade and was positioned in the 890th battalion. Azrai was perceived as a highly motivated and professional soldier during basic and advanced training. He was awarded the option to go on to officers' course and pursue a military career but was involved in an automobile accident in which he was run over by a truck. Azrai was hospitalized but survived. The military initiated an honorable discharge for him due to his medical condition, but he insisted and managed to stay in uniform. His high motivation and value-driven inclination to serve Israel pushed him to forge a medical form in order to get his medical record right. Azrai stayed in the Military and became a platoon Sargent in his battalion. After three years of service as a paratrooper, he demobilized.

Seeking action and meaningful service, Azrai enlisted to become a police officer and served in an elite undercover police unit for three years. During his service, he was awarded and honored for his part in cracking a major criminal case. During this time, he was also physically injured in a clash with a criminal he subdued into custody. Azrai loved his work, but since the pay was low, he explored other options.
He started working independently as a private eye and started his own company: Aviram Netz (Hebrew for Hawk). The Israeli DOJ licenses him as a private detective.

Just after terminating his contract with the Israeli National Police, Aviram married Maggy (born1972). Maggie is a schoolteacher and is currently completing her MA to become an educational consultant. Aviram and Maggie have three children: Daniel 24, Almog 121, and Ariel 13.

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

**Reserve military service:**
According to Maggie, Aviram served the annual maximum days allowed. Between his day job, his family and other responsibilities, he always strived to serve and to join his unit – a reserve Para-brigade battalion, in training and operational duty[1]. An inquiry done with the IDF Chief reserves officer, Brigadier General Ari Singer, has confirmed that Azrai has served more than 300 days during his reserve tenure. A significant number of days by any account.

**The Second Lebanon war:**
In June of 2006 The Lebanese Hizballah attacked an Israeli border patrol, killing two soldiers, and abducting their bodies. This ignited the Second Lebanon war. At the time, Maggie and Aviram were in the US. Azrai heard of the situation and shortened their trip. They flew back to Israel. He called his commander but the last did not want to recruit him. Being self-employed Azrai was supposed to be the last to be recruited (The commander, being himself a reservist and self-employed, knew something about paying bills, salaries etc.). Aviram decided to go. He would not accept no for an answer, and he joined his unit.

After days of standoff aerial attacks, the IDF started the ground maneuvers and put 'boots on the ground' in enemy territory. Azrai's battalion fought in Lebanese territory in different locations, for a number of weeks. Going in and out, they had a few 'close encounters', engaging the enemy. On the last day of the war, just hours before an armistice was to take place, while they were on a hill stronghold , a tank near them was hit by a Cornet anti-tank missile. The paratroopers were near the tank when it exploded. They reached it, opened it up and cleared 3 dead bodies from the scorched tank. One of the crew members was still alive but trapped inside. Aviram worked frantically to try and save him.
During the hostilities, Aviram was marginally hit in the hip by an enemy bullet. An open wound that he had never treated medically. "It's nothing," he would reiterate.

LTC (res) Joseph (Yossi) Berger – Azrai's deputy battalion commander in the 2006 Second Lebanese war describes the background and the tank event:

"I have known Azrai for many years of reserve service, over 20 years. He was a cop and was not obliged to serve in the reserves. He always came and joined the unit. In light of his capabilities and spirit, I took him to be at my side in the frontal

---

[1] IDF reserves are the core of Israel's survival. Many of us serve between 10 – 20 days annually. Most men serve until the age of 40. Units train to stay operational and are recruited when hostilities break.

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

command post. Gaza, Judea and Samaria, Lebanon. We went through some very extreme situations. We had a very deep acquaintance, molded by baptism of fire."
"Azraï was on watch when the tank was hit. We were stationed on a hill, in a plantation. An anti-tank missile attack started. We both saw the tank explode. We started moving in the tank's direction. Azrai could have stayed behind. He chose to join me. Three bodies and one wounded soldier who we worked hard to evacuate from the tank. Indescribable and staggering sights of mutilated bodies after the missile hit. It was awful. Soldiers were crying and shouting. It was bad. One of my men, a good friend of Azrai, was intoxicated from fumes and poisonous gas that he inhaled inside the burnt tank. He lost consciousness and received full CPR and luckily survived. The wounded were evacuated by a helicopter that landed under heavy missile fire. That was both traumatic and a complicated event to manage. After this event, we continued fighting, and then marched up a very steep slope and a long distance to the border, back to Israel, with full (and heavy) combat gear.
When the war was over, we went home. During the first two years after the war, we met quite often. The Tank story came up again and again as one that had a deep influence on Azrai. Despite typically being very quit and low key, Azari seemed obsessed and talked about the tank incident repeatedly, at times he would almost re-enact the event.

We would meet during reserve service and he would tell me about his business, about things that are 'on the edge' (of legal conduct). He would tell me about Cyber and chips and things of that nature. I asked him: "are you sure this is legal?" He always said: "I'm with strong people, that were part of the intelligence community establishment, who know what they are doing". He tried to drag me in."
"I believe that the (tank) event pushed Azrai to the edge. He wasn't like that before the war. A quiet guy, never raising his voice or anything."
"He never mentioned flashbacks or other intrusions, but I think he was trying to figure out who he was. It was as if he had changed. Somehow, he was never the same after the war".
"At a certain point in time, a few years later, while speaking on the phone, he said: 'what could possibly happen to me?'
"That lit a red alert on my side and I quickly organized a reunion to see him and assess the situation to make sure he wasn't losing it". About five years after the war we stopped serving in the reserves."

According to Maggie, Azrai's wife, he came back from the war and shared the tank story. Ever since, "he has changed" she says. He talks about the army all the time, reads military books and has an obsession regarding the military. This started after the 2006 war.

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

The situation has since deteriorated. ▌

▌. On the way home, while driving, he often stops to take a short nap.

▌ Maggie thinks that they are tension related.

Azrai's affect tends to be optimistic in a unique, almost detached way. It seems that he is in complete denial of challenging situations. No temper tantrums. Even when people let him down in business, he still gives additional chances. While being a detective, (naturally suspecting everything and everyone) he still holds a positive view of life and of people.

Azrai defines himself as being lazy. ▌
▌ but does not give himself a break. Maggie sees his ▌
▌.

▌ In his business – he is always thinking about the next phase. A complete workaholic. He made a lot of money but lost much of it gambling.

He does not consume alcohol/drugs/cigarettes. ▌

▌ He takes on big projects like a running/swimming/cycling a Half Iron man.

▌ He is very busy. Has no time for socializing. He has a few childhood friends. A wider social circle that he is not really part of. When they meet at social events, ▌

According to Maggie, Aviram has no personal or family history of mental health issues. She believes that he has an ▌

Aviram suffered the loss of his Father-in-law, who died five years ago, from Alzheimer's disease. He was very close and attached to him. He also took very good care of a friend that eventually died of cancer. These events did not make it easier on him.

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

**Discussion**:

Aviram Azrai has since the summer of 2006, ███████████████████████████
███████████████████████

He has survived a near-death experience in war and has witnessed the death of others close to him;

████████████████████████████████████████████████████, in which he re-experiences the tank event and the war;

While not avoiding the military (as a trigger to the traumatic events) Azrai suppresses his emotions, denying his symptoms and tries to stay positive and functioning;

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

Nevertheless, Azrai shows continual professional functioning. He has turned his ██████████████████████ into an inner engine that has pushed him to work relentlessly while being on edge and pushing the limits to operate in the 'gray areas', on the slippery slope that has led him to the current state of affairs.

██████ tends to affect the way people perceive the world. In many cases, trust, goodness, and fairness are breached. In Azrai's case – it seems that a mixture of "people are good and trustworthy (even after they prove otherwise); I have nothing to lose, and what could possibly happen to me?" have ████████████
█████████████████████████████████████████████████

In this context, it is important to highlight and explain how ██████████████
███████████████████████

**PTSD and flawed decision making**

Many US military veterans, that return from deployments in Iraq, Afghanistan and elsewhere, suffer from PTSD, TBI and other combat related medical conditions. Rates of PTSD sickness vary between Vietnam alumni (15-30%); Gulf war (12%) Iraqi and enduring freedom operations (15-20%)[2]. Many suffer Depression and the veterans' suicide rate is much higher than that of the general population (between 30-100%

---

[2] https://www.ptsd.va.gov/understand/common/common_veterans.asp

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

according to VA data). Nicotine, drug, and alcohol abuse, as a form of self-medication, are widespread and disturbing.

For Israelis, the rate of PTSD among combat veterans is much lower (Lubin et al. 2016). Suicide in the Israeli Defense Forces, among enlisted soldiers, who by definition, are at risk due to age (globally, suicide peaks between 18-23), exposure to stress and availability of weapons, has been on the decline for years. Today's rates are lower than the general population. Suicide among veterans is almost non-existent.

The reasons for these differences between the US and Israel are not known. Junger (2015) hypothesizes that the Israeli society is more emotionally connected, has a stronger shared sense of belonging and hence more 'tribal'. This atmosphere of support and acceptance towards soldiers and veterans is also strengthened by the fact that Israel is one big 'military family'. We all serve in a continuous 'draft' and on the reserves, well into our fourth, sometime fifth, decades of life.

Having said that, another possible reason for this difference, is that many IDF (Israeli Defense Forces) veterans, suffering Post traumatic Stress, go undiagnosed and untreated. Some turn to high risk, well-paying jobs, in security and elsewhere. Others work long night shifts, since they suffer insomnia and have a hard time falling and staying asleep anyway[3].

While Trying to maintain levels of occupational, social and emotional functioning, Veterans dealing with PTSD often exercise strong psychological mechanisms of avoidance, denial and emotional isolation. In doing so, they are sometimes prone to misjudgment and very bad risk management. Clearly, ███████████ personality is fueled by danger (Adrenaline) sensation seeking; pushing the edges, coupled with a rather distorted perception of life and the ground rules in the naturally 'slippery slope' of his business.

---

[3] 'Erim Balaila' is the name of an Israeli not for profit (501c3) that assists former prisoners of war. The Hebrew name literally means 'awake at night'.

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

**Conclusion**:

Azrai is a hero. A soldier that for decades defended his country, his home. His service exposed him to horrendous events, especially in the 2006 Second Lebanon War. Since that war, he never quite returned to the person he was before. On all fronts – personal, occupational, and social, ███████████████

One major change that happened to him is his ████████████████████████

██████████████████████████████████

With honor,   *yotam D.*

CDR (ret) Yotam Dagan
Clinical and military psychologist

Yotam Dagan
Clinical and military psychologist
Dagan.yotam@gmail.com

## References

Junger, S. (2016) Tribe – On homecoming and belonging, Hachette Book group, NY.

VA Suicide prevention data:
https://www.mentalhealth.va.gov/suicide_prevention/data.asp

Isr J Psychiatry Relat Sci - Vol. 53 - No 3 (2016)
Combat Experience and Mental Health in the Israel National Health Survey Gadi
Lubin, MD, MHA, Igor Barash, MD, MHA, and Daphna Levinson, PhD Ministry of
Health, Jerusalem, Israel

https://www.ptsd.va.gov/understand/common/common_veterans.asp

# Exhibit C



**Weill Cornell Medicine**

Psychiatry
John P. Docherty, M.D.
Adjunct Professor of Psychiatry
200 Central Park South
Suite 31A
New York, NY 10019

October 05, 2023

Barry Zone, Esq.
Moses and Singer, LLP
405 Lexington Avenue
New York, NY 10174-1299

Attorney Zone,

At your request, I conducted an evaluation of Aviram Azari (D.O.B. 08/16/1971) to assess two issues: (1) whether or to what extent psychiatric and psychological issues may contribute to understanding Mr. Azari's engagement with the offenses to which he has plead guilty and for which he has accepted responsibility and (2) Mr. Azari's current psychological state and the factors contributing to that state.   In conducting this evaluation, I reviewed (1) Indictment S1 19 CR 610 (18 USC SS371, 1028A, 1343, 1349 and 2), (2) Draft SR Case 1:19 CR-00610-JGK, Document 59, Filed 06/14/22. I also interviewed Mr. Azari on two occasions and members of his family including his wife, Maggie Azari, and his two daughters Danielle Azari and Almog Azari. I also spoke with my Azari's Israeli Counsel Joseph Asch. It is my opinion, based on this evaluation that psychological factors and psychiatric illness do contribute to understanding what led Mr. Azari to have engaged in the behavior reflected in his offenses. In the best of my medical judgment, it was the interaction of two factors that led to the excesses of action on behalf of his clients that are reflected in the offenses cited in the indictment. In addition, it is my medical opinion that Mr. Azari is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### Psychological Factors Effecting Mr. Azari's Offenses

The two factors effecting Mr. Azari are (1) Mr. Azari's essential values and personality structure which is characterized by deep commitment to loyalty, even at the expense of self and self-interest and (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which experienced intensified an excess of loyalty and caretaking. Absent the interaction of these two factors, it is my opinion that the conduct leading to the offenses would have been far less likely to have occurred. This latter opinion is based on Mr. Azari's lack of a history of criminal behavior, absence of a history of substance abuse, absence of personality traits associated with criminal behavior, supportive family relations, his recognition now of the impaired judgment his behavior reflected as well as assessment based on the Federal Post-Conviction Risk factors for recidivism. I will discuss each of these two factors and their effect below:

### Loyalty

A deep and abiding sense of loyalty, dedication and service to family, friends, and country is the

most consistent characteristic of Mr. Azari's personality and behavior. This sense of loyalty was strongly confirmed in interviews with Mr. Azari's wife, Maggie, his daughters Danielle and Almog. Loyalty and altruistic behavior have been a longstanding feature of Mr. Azari's personality and has been evident in every aspect of his life. Mrs. Azari said: "He is very loyal, and he believes in everyone."

**Family**

The fortunate circumstances of Mr. Azari's childhood lay the basis for his loyalty and generosity. Mr. Azari is the product of an intact family. His mother is now 69 and his father is 73. Mr. Azari, age 51, is the eldest child and has two younger sisters ages 48 and 41. According to Mr. Azari's wife, Maggie, Mr. Azari's parents "gave him a great deal of love and a lot of attention." She reported that it was not only his parents but his grandparents and his parents' friends. Also, importantly, Mr. Azari was very close to his paternal grandfather, who spent a  great deal of time with Mr. Azari.  It was in this context that Mr. Azari developed the deep attachment capability and tendency that is central to his character.

Mr. Azari has also had a long-term intact marriage. He was married in 1996 to his wife, Maggie. They have three children, two daughters ages 25 and 21 and a son aged 14.  Mr. Azari's family of origin struggled financially and Mr. Azari, even as a boy, stepped up to help. He helped his father in his moving business and, as early as possible, obtained a license to drive a truck so he could be of more help. While in Israel, he, until his arrest, visited his parents every week.  Mrs. Azari also noted that when her own mother needed help, her mother turned to Mr. Azari in preference to her own son. On another occasion, Mr. Azari's sister had to close her business and at the same time, her husband experienced a heart attack. Mr. Azari stepped in to help and said to his wife Maggie "This is my time. I will help them."

Mr. Azari's relationship with his two daughters is also notably close and supportive. Both Danielle and Almog are happy well-adjusted young women. Danielle is an officer in the Israeli Defense Force. Almog has just completed her military duty. Both speak highly of their father. Almog said "My Dad is like an angel. He wears a halo on his head." They both describe the same sense of trust and always reliable support and encouragement. Danielle said that when things were not going well, her father would do something to make things better and would say "It's all 'sugar', it will be a better day tomorrow." Both also said that their father was very good-hearted and a very kind man. Almog gave, this example: "If my father and I were out walking and he passed a homeless man that he would always stop and buy him food and drink." Both daughters also felt that sometimes Mr. Azari was a bit naïve and could be too good. Danielle said, "He will try to help everyone."

Mrs. Azari reported a number of occasions in which Mr. Azari extended extraordinary help for friends in need. One involved a friend who lost his job because his company closed and he could not find another job. Mr. Azari hired him. Mrs. Azari asked him why he was doing that since he did not need this employee and Mr. Azari replied, "Maybe I don't need him, but for now I do." Further, Mr. Azari kept this employee on for a year after Mr. Azari was imprisoned. Another telling and poignant example was the care that he extended to his best friend after his friend received a diagnosis terminal cancer. They had been friends since age 16 (another example of Mr. Azari's long-term and stable relationships). When his friend became ill, Mr. Azari's younger daughter, Almog, said:" My Dad was his right hand. They were often together 24 hours a day. He took him to his medical treatments. He took him to travel to give him a good time before he died." Mrs. Azari said "Aviram would go to his friend's house and watch his friend so that his wife could get a break." Further, after his friend's death, he looked after his friend's family. Perhaps most revealing of Mr. Azari's loyalty is the comment that he made to his wife Maggie. He said that when he was released from jail and returned to Israel the first thing that he would do is visit his friend's grave.

**Clients**

Mrs. Azari noted numerous instances in which Mr. Azari would continue work for clients who could no longer continue to pay so that he could finish the work he had started on their behaves. Further, she noted instances in which he chose to return client's money if he felt he had not done a good enough

job for them.

I interviewed one specific client, who asked that her name not be included in my report, who was targeted by individuals who began a complex scheme to fraudulently gain control of her company. As it unfolded, odd and perplexing financial and legal problems began without an obvious basis or explanation. As Mr. Azari's client began to raise questions and concerns about the source of these problems and refused to engage in illegal financial transactions, she began to receive a variety of threats and intimidations including physical intimidation and the harassment of her 10-year-old son. The financial well-being and reputation that she had worked hard to create were being degraded and systematically destroyed. She became distraught, desperate, and overwhelmed. The client contacted Mr. Azari, "I was feeling fragile, frightened, and vulnerable and was in danger, and most of all, I was a woman alone with a little boy." She said "Aviram gave me confidence. He gave me support. He could have taken advantage of me I was so vulnerable but instead, he helped me." She said, "He saved my reputation." She stated further that it was only due to Mr. Azari's investigative assistance that she was able to bring these dangerous people to justice. She noted too that there were times in the work that she could not pay Mr. Azari, but he told her not to worry and continued working. She said in summary "He is a humble man, and he saved my life."

The second major factor influencing Mr. Azari's judgment is the result of his military combat experience. This experience, some relevant details of which I will describe below, has embedded in Mr. Azari a deep and painful survivor guilt and an intensification of his sensitivity to and need to alleviate the suffering of those to whom he feels a fiduciary responsibility.

This is not surprising considering the extent of his exposure to active combat. Mr. Azari entered the Israel Defense Force at age 18 and served on active duty for three years. Consistent with his fundamental loyalty and patriotism, he volunteered to be a paratrooper, a prestigious but dangerous role. After training he saw almost constant combat. He would be dropped behind enemy lines to track specific terrorist targets. He stated "We would be ambushed almost every night. There were mines everywhere and suicide bombers." He saw friends die which had a profound effect. However, it was not only friends. He said "It wasn't only soldiers. It was civilians, mothers, children. It was terrible, terrible." He said also "When you are young, you are afraid, but you can't show your feelings. You think you can hold it inside, but you can't." As we were discussing these recollections of his combat experiences Mr. Azari became visibly very upset and was sobbing uncontrollably.

For Mr. Azari the result of these experiences has been the development of a                     Mr. Azari meets all of the criteria for this diagnosis.                     He said "You try to avoid thinking about those times, but you can't. Just some noise can bring it back" and "I can never forget, all my life."                     ("I feel sometimes like I am outside myself looking at the situation from above.") Mr. Azari also endorsed the



a significant contributor to the excessive steps Mr. Azari took on his clients' behaves.

The severity and persistence of Mr. Azari's ▓▓▓▓ was made worse by two subsequent life experiences. First was his service as a police officer. Following his three years of active military duty, Mr. Azari served for three years as a police officer assigned to the surveillance unit. This work involved covert physical surveillance of potentially dangerous individuals. Such work ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ It also reinforced his inherent sense of loyalty because the work often involved concern for his partner who might have been the one in more imminent danger. Second was Mr. Azari's continued military service as a member of the IDF reserve from 1993-2010. During this period, he was returned to active combat on three occasions. The first was in 1996. This deployment was a remarkable example of Mr. Azari's loyalty and dedication. Mr. Azari was on his honeymoon in Las Vegas, NV when he became aware that his unit had been deployed to active duty on the border with Syria. He contacted his commander who told him it was not necessary for him to return to Israel, but Mr. Azari cut his honeymoon short, returned immediately, and joined his unit. During this deployment one of his very close friends died, killed by a bomb. The most impactful of these deployments was the last which occurred in 2006 during the second Lebanon war. This was a particularly brutal and heart-rending experience.

Mr. Azari's unit was deployed near the Saluki River and was protected by a large mound of earth built by a bulldozer which was itself protected by a tank. The enemy was only 40 meters away. The Israeli tank released a smoke bomb to hide its location. However, it had been seen prior to the smoke and the enemy released Russian-made Hornet missiles. Mr. Azari said "You could hear the whine of the missiles all the way from when it was released until it struck. We retreated behind the tank, but a missile struck. I was knocked back about 10 meters. The tank was destroyed. The barrel of the tank was now inside the tank. Its wheels were on fire. Then the bombs inside the tank exploded. One of the soldiers in the tank had his insides hanging out. One of the tank officers had his head separated from his body. The driver was alive, but we could not reach him. The hydraulic unit was not working. Another unit nearby was also hit. People everywhere were dead and injured. Missiles kept coming. We had to remove an airway from one dying soldier to give it to another who had more chance of living. It was very, very bad. I was in total shock." This experience greatly intensified ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## Federal Post Conviction Risk Assessment (PCRA)

The PCRA is the most well-validated of the instruments currently used to predict risk of recidivism. It is scored based on an assessment of 29 items including criminal history, education and employment, social network, substance abuse, and pro or anti-social attitudes. In addition, there are a variety of miscellaneous items such as access to transportation, homelessness, low intelligence. The only one of these 29 items for which Mr. Azari scores ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓. Both are treatable. . Applying this scale and the principles of this scale predict that Mr. Azari has a minimal to no risk of recidivism.

## Summary and Impression

Diagnosis: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

It is my opinion, to the best of my medical judgment, that Mr. Azari engaged in the offenses to which he has plead guilty as a product and interaction of two factors: (1) his inherent character and value system amplified and distorted by (2) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Mr. Azari's early upbringing created in him a personality and set of values reflected in loyalty and caring for those for whom he had a fiduciary or perceived fiduciary relationship. This action tendency was greatly amplified by the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ which produced in him an intense sense of obligation to do everything possible to help his comrades. Unfortunately, it also embedded a sense that there are lethal

enemies, and any loss could mean death ("You can win many times, but you lose only once.") Things are permissible and right in war that are not in ordinary civil life. As revealed in Mrs. Azari's recounting of Mr. Azari's constant pre-occupation with war and threats of war and his flashback experiences, part of Mr. Azari's mind is a constant war-time status. It is my view that Mr. Azari's ███████████ ████████████████████████████████████████████████████████████████████████████████, the likelihood of his having engaged with the instant offenses would have been significantly less. Nothing else in Mr. Azari's life otherwise explains these excesses. On the contrary, everything else is consistently pro-social. One of the earliest texts on occupational medicine is dedicated to all those who die or are injured by the work they have undertaken to sustain their lives. It is unfortunate that the nature of his work allowed for and stimulated the excessive expression of his otherwise admirable traits of loyalty and caring. In my discussions with Mr. Azari, he is aware of these failures in judgment and is remorseful for these and for the unintended injury and sadness these have caused for all those affected. It is my opinion that Mr. Azari is not likely to engage in any such activity in the future. In addition to the reasons that I have noted above, this opinion was strengthened by Mr. Azari's comment to me as we concluded my interview. He said "I am tired of battles. I just want to be Switzerland." Finally, I recommend that Mr. Azari receive treatment for his ████████████████████████

## Current Psychological State and Significant Medical Contributing Factors

**Current State**

Mr. Azari is ████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

**Contributing Factors**:

I will discuss three contributing factors to Mr. Azari's current psychological state of health (1) Mr. Azari's medical diagnoses, (20 Mr. Azari's history of treatment of these disorders and (3) the effect of these disorders on Mr. Azari's physical, social, and psychological health.

**Medical Diagnoses**

Mr. Azari is suffering from a ████████████████████████████████████ His current diagnoses are ██████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████

**Treatment History**

Mr. Azari's treatment history is characterized by delayed, disconnected, and denied care. Mr. Zone has reviewed and referenced the conditions at MCC during the period of the Covid epidemic. Mr. Azari

suffered the onset of his symptoms towards the early part of 2020 when he was incarcerated at MCC. At that time, ███

███ He was brought to the medical clinic several times but only once examined by a physician who recommended that Mr. Azari be hospitalized. This recommendation was not followed, and no treatment was provided. In about May of 2020 Mr. Azari's pain ███████████████████████

███████████████████████

Mr. Azari was transferred to MDC in July 2021 and requested medical attention for his illness. No substantial medical care was provided, however, until March 2022, a full two years after the manifest onset of his disorder, ████████████████████████████ The consultant diagnosed ████████████████████████████████████████████████

████████████████████████████████████████████████████████

The test itself, a prerequisite for the consultation, was not scheduled until early June. Mr. Azari was ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ However, on this occasion, while Mr. Azari was in solitary confinement there was a lockdown and Mr. Azari seems to have been forgotten and was left in solitary confinement without food for 56 hours. He was subsequently discovered when guards heard his calls for help and was found collapsed on the floor of his cell. He finally had the procedure in July and the diagnoses listed above were found. ████████████████████████████████ Mr. Azari was ███████████

███████████████████ was another delayed and frustrating experience for Mr. Azari.

[REDACTED]

**Effects of the Illness on Mr. Azari's Physical, Social and Mental Health**

**Physical Effects**

[REDACTED]

**Psychiatric Diagnoses**

[REDACTED]

**Impression**

The sum of these multiple sources of suffering has produced [REDACTED] is now additionally experiencing. The Nelson Mandela Rules that the UN General Assembly adopted in 2015 require that the prison authorities provide inmates with health care consistent with the same standards

expected in the community.  The care provided to Mr. Azari appears to have fallen far short of those standards.

Sincerely yours,

John P. Docherty, M.D.

1234 Primary Address, New York, NY 00000 |  T. 000.000.0000  |  C. 000.000.0000  |  F. 000.000.0000  |  E. jsmith@med.cornell.edu 1234 Secondary Address, New York, NY 00000  |  T. 000.000.0000  |  C. 000.000.0000  |  F. 000.000.0000  |  E.  jsmith@med.cornell.edu

# Exhibit D

1

**Provided by**:   Lotem Vinter (Sister)

**Occupation:**   Buyer

**Address:**   2 Halzdarechet St., Udim

**E-Mail:**   lotemvinter@gmail.com

**Date:**   23 May, 2022

**Mobile:**   +972-52-343-6528

My brother Aviram is a law abiding citizen, a decent and honest man, a devoted family man with a high degree of interpersonal values, with an impressive military record and a great contribution to the country in which he lives.

On a more personal note – Aviram is my beloved, older, favorite, brilliant and decent brother. More than a decade separates us. He is my big brother who I will always look up to and whose opinion I will always seek.

The day he was arrested and taken from our lives was a difficult day for me. We've been living in the fog for three years, not knowing the conditions under which he is being held, when he will be released and his medical state.

From the day he was arrested, I feel great frustration and my trust in the legal system has weakened.

My brother played a big part in my life and his absence is noticed every day. His ample experience, his generosity and leadership always encouraged me to consult with him in diverse business and personal matters. He was always there for me, supportive and ready to help.

In addition, during his detention he was absent in a very significant event in my life and the lives of our families – my eldest daughter was born and did not get to know her uncle.

Our lives are incomplete since the day he is not present in them. I hope the legal system will show decency and release him soon.

# Exhibit E

Almog's letter:

I was asked to write a letter about my dear Father.

Hello, my name is Almog Azari, I am 20.7 year old, I was honorably discharged from the Israeli Defense Force recently, I am a little sister to Daniel (Danny, 24) and a big sister to Ariel (Ari, 13).

I would like to share a few words about my dad.

I guarantee that my letter will be the most the most exciting and touching letter you will hear, since my dad means everything to me.

My father, Aviram Azari, 51, the only and only.

I will start by saying that for a long time now, I haven't had the chance to write much these days, even though I enjoy unloading my thoughts through writing. For two and a half years now I have been writing to my "Abush" on WhatsApp, sharing with him daily things happening in my life, whether they may be crises or experiences.

Although my father has not read what I have been writing to him for almost three or more years, this is my way of completing missing conversations I very much lack with him, the connection, and the fact that he is not with me.

My father is a special man, he is the first one I would point to and say "this is a man who is just one big heart", although he may look tough, with him being 1.87, with a round belly and bushy eyebrows, but my father was always the man everyone wanted to be around.

Starting from my childhood, I believe I started to admire Abush like that, like a role-model.

My father is a former paratrooper, completely addicted to the army and was unwilling to accept that we might not enlist or do any service for the country.

It's important for me to say and share that the issue of mandatory army service has always been a Friday meal conversation. As a child, my dad would always share experiences from his service and what he went through as a fighter. At the end of the conversation, he would always ask what you were thinking to do when you enlist.

Before my recruitment, my dad planned a pre-military trip to the US for me, full of many experiences.

Unfortunately, the trip didn't happen and within a few days my mother, brother, and I returned to Israel.

The day of my enlistment had come, and may I say how difficult it was for me to see other soldiers accompanying their parents and families. I, on the other hand, was accompanied by my mother, brother, and friend. My older sister was in the army and could not be released.

The hardest part about the army was my father, how he was not by my side, and how he couldn't send me off to the army. On the one hand, I was proud of myself that despite the difficult time (my father was not at home) I was able to enlist in the army, but on the other hand I was very sad that my father was not with me.

When enlisting in the army, all I could think about was how I would serve as close to home as possible in order to be with mom and brother at home. (My sister is an army officer, and she is rarely home). I also had to juggle army and evening labor to help at home financially.

I would like to say thank you to my dad, thank you for everything you taught me in all my life, because of that I have been able to go through a tough two years in the military. A complex period because of dad not being home, the pandemic, and intense longing.

My dad loves to read books related to the military, to watch movies and tv series related to the military, he even cried in front of the TV when we won the Eurovision (which is still an honor).

I can say that even from a distance my dad always was and will be the anchor, the compass, the only man I wanted to hug when it gets hard, or to wipe away my tears, even if it's happy tears.

My dad always taught me that the sky is not the limit and that it is somewhere to aim, never lower your head when you fail, and to always look at the half full glass. I'm pretty sure I got that optimism from him.

My father was born on 16.8.1971 which means my father is Leo.

He really is a real lion and I'll explain why. A lion is one who is the leader of the tribe, he sweeps after himself (for good of course), takes care of everyone, knows when to get angry when needed and to also punish, and how can one not notice that my father is like that.

My dad is the most stubborn lion ever seen in the wild.

I will say what I usually say about my dad, my dad and I are so connected that he comes after me everywhere. At the age of 17 on a Hanukkah holiday, I flew to London with my friend. On the second morning of the trip we went down to the lobby to start the day and saw a familiar face, my friend says "Look at how this man looks like your dad" while I turned my head, my dad raised his hand smiling ear to ear and said "you can now start the celebration – I have arrived", funny story right? I have another one.

I flew to Poland in my junior year of high school, a very powerful and exciting trip. A Holocaust trip remembering the falling of the Jewish people. One day we stopped for a meal break in a large parking lot, one of the kids yelled "Look who's coming to eat with us! Is that Almog's father?!". Believe it or not, but yes, my father got out of that rental car, and walked towards me with a McDonald's meal. Before we went on the trip, my dad offered to join us as an accompanying parent, but unfortunately the parents weren't invited to the trip. He insisted

anyways on joining the trip and came independently to support me in difficult moment and to be proud of me as I march with the Israeli flag.

It seems to me that there are no many word left to say, my father is just a never before seen special character. Needless to say, how deep my longing is and the hole that has remained in my heart since my landing at JFK airport.

In short, and to the point, I would be very grateful if you would bring my dad home because he is most very missed by me and everyone else.

# Exhibit F

שמי דניאל אזערי, אני בת 24 מקרית ים. לאחותי קוראים אלמוג, לאחי אריאל ולאמא שלי קוראים מגי
לאבא שלי קוראים אבירם, והוא הסיבה שאני כותבת עכשיו את המכתב הזה.
האמת, כשאמא שלי ביקשה ממני לכתוב משהו קטן על אבא, לקח לי הרבה זמן לקחת את זה בידיים
ולהתחיל. רק כי זה לא פשוט להכניס את כל הרגשות שלי למכתב אחד.
אבל אני אתחיל מהסוף, אני קצינה בצבא ההגנה לישראל, בתפקיד סגנית קורס הקצינים בחיל
הלוגיסטיקה, ואני מבצעת הגנת יישובים בגזרת יהודה ושומרון. כשנוסעתי לבקר את החיילים שלי באחת
הנקודות, עברתי ליד עמדה שתגברתי פעם, בחודש ספטמבר 2019. הייתי קצינה לוגיסטיקה בגדוד חי״ר,
המשפחה טסה לטיול בארצות הברית ותכננתי להצטרף אליהם אחרי שאסיים את התורנות שלי בגזרה.
ערב ראש השנה, מבצעת את המשימה שלי ומקבלת שיחה ממאמא. שמחה לשמוע שהם נחתו והטיסה עברה
בשלום- פחות שמחה שהטיול שהטיול התחיל על רגל שמאל.
אבא נעצר.
בהתחלה זה היה נשמע כמו טעות, או סיפור שנצחק עליו יום אחד, אבל בינתיים עברו כמעט 3 שנים ואבא
שלי עדיין מעבר לים.
לאורך כל החיים אבא שלי היה לצדי, ובשנים האחרונות הוא נמצא קצת הרבה פחות.
בשירותי הצבאי, כמפקדת ובהמשך בתור קצינה בגדוד לוחם, אבא שלי הוא האדם היחיד במשפחה שלי
שבאמת הבין אותי. רק אליו פניתי כדי לשתף בעיות ובהתלבטויות שלי, פשוט כי ידעתי שכתשובה
לשאלה שלי יגיע סיפור מרתק מתקופתו כלוחם בחטיבת הצנחנים של צה״ל, במקרים אחרים, כלוחם
במילואים במלחמת לבנון השנייה.
עברתי חוויות לא קלות במהלך השירות הצבאי, והשירות נראה לגמרי אחרת בימים שאבא היה בבית
לעומת הימים שכבר לא.
מאז שאבא נעצר, הספרייה לפרוץ מגיפת הקורונה, ואני עברתי לתפקיד חדש בגדוד אחר. בתור סמ״פ,
הייתי צריכה להתמודד עם הרבה החלטות לא פשוטות, ותמיד התקשיתי למצוא את הדמות להיושען עליה
כשאני מתלבטת. מאימון ברמת הגולן לקו לבנון, עדיין לא יודעת מתי תהיה הפעם הבאה שאתייעץ עם
אבא (אגב, במיוחד כי בתקופת הקורונה נשארתי בבסיס ימים ארוכים ברצף ולא זכיתי לשבת בסלון עם
המשפחה כשאבא מתקשר).
במשימה מבצעית איבדתי חייל. אחרי כמה ימים קיבלתי שיחה ממספר לא מזוהה. אבא התקשר לחזק
אותי מרחוק. זה לא היה הרבה, אבל זה נתן הרבה כוח להמשיך.
כשבועיים וחצי לאחר מכן, סבתא נפטרה. סבתא זה כל כך אהבה את אבא, ממש העריצה אותו. את הגישה
החיובית לחיים, את האופטימיות ואת הרצון לתרום ולתת לכל הסובבים אותו. היא כל כך דאגה לו
בתקופה שלא היה כאן, דאגה לשלומו ולבריאותו הפיזית והנפשית. צר לי שסבתא עזבה אותנו לפני שהיא
זכתה לראות את אבא מתאחד שוב עם המשפחה.
הימים עברו ואני מפקדת בקורס הקצינים של חיל הלוגיסטיקה. ובכל מחזור מחדש, בכל שיחת פתיחה,
אני נמנעת מלספר על המשפחה שלי. לא כי אני מתביישת, אלא כי מרגיש לי שאסור לי להציג את המבנה
הנוכחי שלה כמצב נתון. מה זאת אומרת אבא שלי עצור? זה עניין זמני, זה לא סטטוס קבוע.
סבתא הילדה, סבתא של אבא, נפטרה גם היא בתקופה הזו. עוד אירוע מצער שלא זכה להיות חלק ממנו,
כי הוא הרחק מכאן ולא ידוע מתי יחזור.
אחי אריאל, עלה לתורה וחגג את בר המצווה בהגיעו לגיל 13. והסתפק בשיחת טלפון קצרה מאבא שבירך
אותו במזל טוב. הרי לצערנו הוא לא יכול היה להגיע לבית הכנסת וללוות את אריאל בעת הפיכתו מילד
לנער.
אחותי אלמוג, שהתגייסה כחצי שנה אחרי שאבא נעצר, הספיקה להשתחרר בחודשיים האחרונים אחרי
ששירתה בכבוד בצבא ההגנה לישראל.
אמא שלי אחרי ימים קשים מאוד לעיכול ההרכב החדש לכאורה של המשפחה שלנו, היא הספיקה לעשות
תואר שני בייעוץ חינוכי, ולהצטיין בעבודה החדשה שלה כיועצת בבית ספר יסודי בקרית אתא.

אציין גם שבשנה האחרונה קיבלתי תעודות הצטיינות בשירות הצבאי, כשלאחרונה קיבלתי את דרגת
הסרן בטקס מרגש- שאבא לא הגיע גם אליו.

סקרתי רק כמה אירועים קצרים מהתקופה האחרונה שלי בצבא. אני לא יודעת מה הדרך הנכונה ביותר
להעביר את המסר.

אני יכולה לכתוב שורות על גבי שורות על כמה נהדר אבא שלי.

אני יכולה לספר את הבדיחות השנונות שלו, שמבהירות כמה הוא מצחיק ואינטליגנט.

אני יכולה לשלוח סרטונים מהילדות שמראים כמה הוא חלק ממני ומהמשפחה שלי.

אני יכולה להוציא ספר עם כל הסיפורים שהוא המציא כשהשכיב אותי לישון, והשירים שזמזם כדי
להרגיע אותי.

אני לא יכולה להסביר במילים כמה הלב שלו רחב- כלפי המשפחה, החברים, בעלי חיים והאמת... שפעמים
רבות גם כלפי אנשים זרים.

ועם זאת, בכל פעם מחדש אני מבינה שיש לי עוד זמן לחכות עד שאוכל להגיד בגאווה ״שמי דניאל אזערי,
אני בת 24 מקרית ים. לאחים שלי קוראים אלמוג ואריאל ולאמא שלי קוראים מגי. לאבא שלי קוראים
אבירם. וכולנו חיים בשלווה, ביחד״.

My name is Danielle Azari, I am 24 years old, and from Kiryat Yam. My sister's name is
Almog, my brother's name is Ariel, and my mother's name is Maggie. My father's name is
Aviram, and he is why I'm writing this letter now.

The truth is, when my mom asked me to write something small about my dad, it took me a long
time to start writing because it's not simple to pour all my feelings into one letter.

I will start from the end, I'm an officer in the IDF, a Course Deputy Officer in the Logistics
Corps, I also defend local settlements in the Judea and Samaria sector. When I went to visit my
soldiers at one of the points, I passed a position I had once covered, in September 2019. I was a
Logistics Officer in an Infantry battalion, my family flew on a trip to the United States and I
planned to join them after I finished my duty in the sector.

New Year's Eve, while on an assignment I got a call from my mom. I was glad to hear they
landed, and the flight passed safely – but I was less glad to hear the trip started on such a bad
foot. Dad was arrested.

At first it sounded like a mistake, or like a story we would laugh at one day, but it's been about
3 years and my dad is still overseas.

Throughout my life my dad had always been by my side, but in recent years much less.
In my military service, as a commander and later as an officer in a combat battalion, my father
was the only person in my family who really understood me. I only him I turned to share my
problems and dilemmas, simply because I knew that in answer to my question would come a
fascinating story from his time as a fighter in the IDF Paratroopers, in other cases, as a reservist
in the Second Lebanon War.

I went through hard experiences during my military service, and the service looked completely
different on the days my dad was home compared to the days when he was no longer.
Since dad was arrested, the pandemic had broken out, and I moved up a new position in
another battalion. As a Lieutenant Colonel, I had to deal with a lot of difficult decisions, and I
always had a hard time finding what to lean on when I was indecisive. I'm training in the
Golan Heights going towards the Lebanon border, I still do not know when will be the next

time I consult with my Dad (especially because during the Corona period I stayed at the base for long days in a row and did not get to sit in the living room with family when Dad calls). In an operational mission I lost a soldier. After a few days I got a call from an unidentified number. Dad called to strengthen me from a distance. It was not much, but it gave a lot of strength to continue.

About two and a half weeks later, our Grandmother passed away. Grandma loved Dad so much, she really adored him. The positive attitude towards life, the optimism, and the desire to contribute and give to all those around himself. She cared so much for him while he was not here, cared for his well-being and physical and mental health. I'm so sorry Grandma left us before she got to see Dad reunite with the family.

A period has passsed, and I am a commander in the Logistics Corps officers' course. In every officers' cycle, in every opening conversation, I refrain from telling them about my family. Not because I am ashamed, but because I feel I shouldn't present my current situation. What does it mean that my father is in jail? It's only a temporary matter, it is not a permanent status. Dad's grandmother, also died during this period. Another unfortunate event that he did not get to be a part of, because he is far from here and his return is unknown.

My brother, Ariel, went up to the Torah and celebrated the Bar-Mitzvah when he turned 13. He settled for a short phone call from Dad congratulating him. After all, unfortunately, he couldn't come to the synagogue to see Ariel become a man.

My sister, Almog, who enlisted about six months after my father was arrested, was honorably released in the last two months from the IDF.

My mother, after hard work, managed to finish her Master's degree in Educational Counseling, and now excels in her new job as an Elementary School Counselor in Kiryat Ata.

I will also note that in the past year I have received certificates of excellence in military service, when recently I received the rank of Major in an exciting ceremony - which Dad did could not attend either.

I have only reviewed very few events from my recent time in the military. I'm not sure the best way to convey the message more properly or clearer.

I can go hours talking about how great my dad is or tell his witty jokes, which show his humor and intelligence. I can show you videos from my childhood showing how much he is a family man. I could publish a book filled with all his stories he told putting me to bed, and the songs he hummed to put me to sleep.

Words cannot explain how big a heart he has – his kindness towards his family, friends, animals and to tell the truth…also many times his kindness towards complete strangers.

And yet, each time I have to realize I have more time to wait until I can proudly say "My name is Daniel Azari, I am 24 years old from Kiryat Yam. My brothers' names are Almog and Ariel and my mother's name is Maggie. My father's name is Aviram. And we all live peacefully, together."

# Exhibit G

Maggie's letter to Aviram -

My relationship with Aviram, the father of my children, my husband, and good friend, began about 32 years ago.

Aviram and I met I was in the army; I was a soldier teacher and Aviram was a paratrooper.

Since then, Aviram and I have been living together for some time.

I would like to tell you about the person who, until about three years ago, gave me confidence, strengthened me, believed in me, and always made sure to empower me.

But before, a little about myself: For about twenty-eight years, I've been a teacher and mentor teacher. The teaching profession is exhausting, difficult, and very complex. With all the difficulties the profession brings, it also brings great satisfaction. By touching a child's psyche, educating them and providing knowledge and tools for life and values.

After years in the teaching profession, I wanted to make a change. I was terribly afraid of change and of higher education. Aviram was the one who pushed me to go to school again, and who helped me identify my strengths and encouraged me to do so.

Two years ago I graduated with an MA in Educational Counseling. Last year I was awarded the title. During my studies I imagined the moment of me being awarding my degree, but unfortunately as the moment approached I ran. At the moment of receiving the degree, with honors, my head was elsewhere, thinking about Aviram, his return home to our children and family.

Aviram was always by my side in all our family experiences: the birth of our three children, Shabbat meals, holidays, family trips, and even harder challenges like raising our children - thinking together about their education, development, and giving values to life.

Aviram and I also had less pleasant experiences: two miscarriages, my father's passing about six years ago. Whoever supported me, was there for me, knew how to say the right word at the right time was Aviram.

In the last three years, since Aviram got arrested, I went through a few things that which made Aviram's absence very hard and significant for me.

Two years ago, my middle daughter enlisted in the military. We sent her off without Aviram. The challenges she faced, a girl who just wanted to be home to support her little brother and mother, were unbearable because there was no one at home who would give the confidence, who would encourage, strengthen, and help.

Even when he was released from the army, Aviram was not present.

About two years ago my mother passed. I remember very clearly my father's funeral, about six years ago. I was heart-broken and in pain but Aviram was

stood by my side, supported me during my most difficult period in life and helped me get through it all.

This time, I stood in front of my mother's grave, a woman who I loved and appreciated so much, and my sadness was double. The fact that from that moment on I was orphaned from both my parents, and how I felt so alone in the world. It is true that I am beloved and have loving children, and in front of them I must be strong and I must support them, especially after losing a beloved grandmother - but who will be with me? On who's shoulder am I to cry on? To whom can I tell what is on my heart? To be clear, that before Aviram, the father of my children and husband, is a good friend, a true friend.

About two months ago we celebrated our little son's Bar-Mitzvah. Aviram was not present at the Aliyah to the Torah in the synagogue and at the event which we have been waiting for for 13 years. The event was mixed with moments of great longing, such an event is celebrated once in a lifetime, an event which will never repeat. A bar mitzvah event is one of the significant events for the Jewish people. This is the stage where, beyond reading the Torah, a child becomes a teenager and enters the adult world. Our son, Ariel, entered the adult world, ascended to the Torah to recite the Torah, just without his father.

Over the past three years out eldest daughter, an officer in the Army, has been serving in the Army for about five years and we have gone through several proud experiences that I am sure that if Aviram had been with us his heart would have full of pride.

Daniel, out eldest daughter, has received several certificates of excellence for fulfilling her role in a professional, serious, and thorough manner. At the awards ceremony, Danielle refused to have his family present. She did not want to feel the hard feeling that her dad was not with her.

About three months ago, Danielle was promoted to the rank of major and a graduation ceremony was held. The small children and I traveled alone for a four-hour trip to take part in the ceremony.

Friday meals is a very important thing with no exceptions for any Friday.

Friday night is a moment of Shabbat prayer, togetherness, and sharing and a moment where we teach the children what a family is as a supreme value.

Since Aviram is not at home, Fridays are not the same anymore. Friday dinner is a meal where we pray for Aviram's return home, to bring the family back to its fullness and to be together.

During the three years that Aviram was not at home, we went through a very difficult period.

Missiles were fired into Israel, I had to enter the security room alone with my youngest son, while my two elder daughters were in the army. I remember the hard moments of fear, apprehension, and helplessness.

The Corona virus period brought lockdowns, isolation and great concern for our eldest daughter who fell ill with corona as well as our younger son who also fell ill with Corona. The Corona period was particularly difficult for us. The whole time we were just worried what about Aviram, how does he feel? It was precisely during this period, that we especially wanted to hear his voice, that he himself was more isolated and could not call home.

In August I will mark the two-year memorial service my mother's death. I long for the moment when the year Aviram will be by the family's side and return to support and strengthen us.

My Aviram does not hang laundry, does not cook or clean the house, and at the same time is the person next to whom I feel most safe, with whom I can pass any obstacle, dream and fulfill, learn optimism, receive better proportions on life, learn unconditional giving, understand how to compromise, to judge people properly and not be harshly judgmental.

# Exhibit H

Dear Aviram,

I will forever be grateful for your deep and loving friendship with Sagiv. From the age of 10, when you were in elementary school, you took care of each other, going together to football games in the neighborhood. Your friendship continued with a long trip to South Africa, selling photos. You traveled a lot, long distances, and met a lot of nice people who gave you good experiences. The strong bond between you allowed you to enjoy and laugh so much.

Later, when you started your own family with children and intensive work, you always made sure to call Sagiv in the mornings and meet him for long conversations over a short coffee in the neighborhood café. You would have conversations, reminiscing about the past, so simple, and so much fun.

When Sagiv fell ill at age 47 you were always by his side. You suggested him to go get cancer treatment in the United States, reinforcing him with stories of recovery from the terrible disease by telling him stories from your childhood and adolescence. When Sagiv 's condition declined, you supported us and the children. You would quietly wait under our house to take the kids to school, you always asked if I needed anything, you asked to come sit next to Sagiv just to see him sleep and be by his side when he woke up.

Sagiv had the pleasure of a true, loyal, and supportive friend. You were attentive to problem solving, you advised him when he started his business, and you were always so attentive and available to him. Your close relationship made people think that you were twin brothers: you both have blue eyes, a full and bright face, and a belly that shows your love of food and flavors. When the moment arrives, when you get home and walk in the door, it will be as if half of Sagiv has come back. I'm very sure the kids and I will be strengthened from you going on the roller coaster of life. We are already waiting to hear from you about those experiences together, what Sagiv said, what he did, and how he would react to life events.

I miss you a lot, I am constantly praying that you will return quickly, and I plead your punishment be lightened.

Waiting for you always and loving you: the kids and Moran.


** Sagiv passed away from cancer on April 29, 2019

# Exhibit I

1

A letter for Aviram

My name is Daniel Schneider, ID. No. 305473142. I am 31 years old and I want to tell about the character of Aviram Azari.

The first thing the nurse that treated me in the hospital told me after I was diagnosed with cancer, was that 40% of my recuperation will depend on chemotherapy and 60% of my recuperation will depend on my mental state.

The treatments were very severe, they were painful. They are distorting, they weaken the body immensely and they isolate you from the family, friends and routine, and all this for 40% recovery. To increase this chance, I knew that I must meet people, laugh and engage in other things. It is almost impossible when you lie in the oncology ward while devastating materials flow through your veins 5 days every other week for several months.

To prevent a complete collapse of the body there was a week interval between cycles. At the hospital, I was advised to build myself a certain routine - to go for walks, to eat [when there was no nausea], to see people, and if I could also work parallel to it, it would be a miracle. Work forces us to get up, to walk, to engage in social interactions and, most of all, to think and be engaged in a very different nucleus from the harsh reality the illness and treatments take the body through.

Shortly before contracting the disease, I resigned from my first workplace as a website designer, so I had nowhere to return. It was unlikely to think that I could find a job in my condition, but anyway, I still reached out to people I know. I explained the situation and tried to convince them that I would do a little works, just to be engaged in something. But none of the people I approached could afford to employ a cancer patient. It is impossible not to understand them; people have their big and small troubles and most people do not have the emotional strength to deal with such a huge trouble of a stranger. Even close friends stayed away from me at the time due to the difficulty of containing it, so what could be expected from distant employers? These refusals, more than anything else, made me internalize my situation, a cancer patient. I can hardly contain this insight today.

In one of the treatment cycles at the hospital, my father told me about a friend of his, Aviram, who heard that I am a website designer and that he needs a website

for his company. I realized that my dad was saying it jokingly since, by that point, it was clear to me that if Aviram knew that I have cancer he would not want me to design his website. But my father explained that he knows all about the situation and he still wants me to come to his offices even only for two or three times a week. I was very skeptical, but I could not help but get excited, for me it was not only an opportunity to create a routine and improve my mental state, but I could also gain real experience in my field.

I met Aviram at the end of the chemo cycle, he explained what site he needs me to design, set up a station for me, introduced me to the team and against all odds I found a job as a cancer stricken website designer.

It was great to come to the office, to eat lunch with them, to snack during the day, to laugh with friends and even to take the bus. In terms of work, I was never pushed to finish quickly, I made full design processes and tried all kinds of sketches I developed and expressed my ideas without anyone pushing me. Everything was great.

Thank God today I'm healthy and when I remember working for Aviram, I realize in retrospect that he did not really need that website and probably rarely used it. That site was an excuse to help me. It moves me to tears to think that while people, close and distant, good and busy could not find the strength to help me, Aviram who did not know me at the time, did above and beyond not only to help me, but to help me feel needed and healthy, not needy. I know that much of this recovery is thanks to Aviram' s kindheartedness and generosity. It breaks my heart to hear that a man that an aura of an angel hovers over his head, is going through indescribable mental hell. Very few people on earth today would do what he did to save me from this damn illness. He deserves nothing but good.

Since the opportunity given to me by Aviram, I started a successful independent business as a designer and worked with leading Israeli and international start-ups and technology companies, like Citi, Appsflyer, Yotpo, Wix and Riskfield as designer, advisor, lecturer and professional mentor. I planned and developed design systems and recently I joined Bizzabo company full-time as designOps manager.

# Exhibit J

1

# Character Testimony Aviram Azari

**Provided by**:  Jacov Sharvit, ID No. 028593952

**Occupation**:  Police officer, 30 years on the force. Currently deputy station commander, superintendent.

**Address:**  24 Derech Tsarfat St., Haifa, Israel.

**E-Mail:**  Jakov38@gmail.com

**Date:**  11 May, 2022.

**Mobile:**  +972-50-733-6429

# Details of Testimony

1. My acquaintance with Aviram began in 1993 upon our recruitment to a special unit of the Israeli Police that surveilled senior criminal factors in the Northern District, considered prime crime targets in the region.

2. From the start, we developed a deep acquaintance and friendship that goes on until today.

3. I served with Aviram for 3 years, from 1993 to 1996.  Aviram was considered among the best professionals in the unit whose most prominent traits include: determination, courage and seeking engagement. In addition, values of camaraderie and friendship were highest in his mind.

4. I remember an event in which we followed large drug dealers in a drug deal of 30 kilograms of cocaine near Tiberias in northern Israel. While there were many forces on the ground at the time of the arrest, one of the traffickers slipped through the arresting forces with a bag of drugs. Aviram identified the suspect and chased him through the olive groves, apprehended him and subdued him by himself. It should be noted that he was awarded the Medal of Merit and Appreciation, preventing a great deal of embarrassment by preventing the suspect's escape with significant amount of drugs.

5. In the unit, Aviram was a social marker, well liked by all and always enlisted to help and offer assistance even when he wasn't required to do so, demonstrating an exceptional voluntary spirit.

6. I left the unit in 1996 and went on to be a Narcotics Detective in the Central Unit of the Northern Region. Aviram also left the unit and the police at the same time and started his way as private investigator after undergoing training. Over time, he opened a large and successful investigation office.

7. Over the years as a private investigator there were many incidents in which he reported burglaries and violence to me and the local police without receiving any compensation, out of

2

care and concern for society, using his own means and always willing to testify and give any necessary assistance to prevent and reach the perpetrators.

8. As I mentioned above, Aviram and I are very good friends; we also know the families and we've had quite a few meetings together. It is important to note that Aviram is married and father of three: two daughters and one son, who are raised to love others and show modesty, investing the best of his ability to provide them a future and an education. His children are well educated, his eldest daughter was accepted to IDF officers' course, which is not to be taken for granted.

9. My eldest son joined the paratroopers and currently serves today as a combat officer and deputy company commander. When my son joined the army, Aviram, who served as a combat paratrooper in the IDF, helped him to mentally prepare. I witnessed encounters between Aviram and my son and was then exposed to Aviram' s stories of his service in the paratroopers, about the harsh hikes, the path to becoming a fighter, Israel's combat in Lebanon where he participated countless operations. It was exciting to hear about his heroism, courage and sense of mission alongside the values of friendship and camaraderie.

10. A little about Aviram as I see him: He is a modest, humble and intelligent leader, socially dominant wherever he was. His name precedes him in every framework where he acted. People rely on him and know he is good for his word. He does not lie, always tells the truth. An exemplary father and husband. A real friend who knows how to be there even in times of crises and situations in which one needs advice and true support from a friend.

11. Honestly and fairly, I wish I could orally express the content of this document and give testimony on the man. I feel that all I had written does not fully cover Aviram' s wonderful character and qualities.

Best regards,

Jacov Sharvit

# Exhibit K

16 May 2022

## Aviram Azari

Aviram served under my command for 10 years in reserves in the Northern Paratrooper Brigade, Battalion 9263.

Throughout his service, he demonstrated dedication and professional responsibility in his various posts.

Aviram greatly assisted his reservist peers and was thus promoted to be my operational driver and my right hand in my various roles in the battalion.

He fought in the 2nd Lebanon War under my command in Summer of 2006, demonstrating exemplary performance in difficult situations and under fire.

After the war he continued to serve under my command and has helped greatly in supporting and accompanying the casualties the bereaved families.

Today I am the owner of the WAVES surf club in Ashdod.

Best regards,

Lt. Col. Yossi Berger (res.)
(-) Signature
ID: 022331607

# Exhibit L

**Table 30**

**SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE
IN EACH CIRCUIT AND DISTRICT[1]
Fiscal Year 2020**

| CIRCUIT District | TOTAL | WITHIN GUIDELINE RANGE | | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | **64,233** | **32,358** | **50.4** | **261** | **0.4** | **5,270** | **8.2** | **6,918** | **10.8** | **2,534** | **3.9** | **16,892** | **26.3** |
| | | | | | | | | | | | | | |
| **D.C. CIRCUIT** | **270** | **96** | **35.6** | **2** | **0.7** | **31** | **11.5** | **0** | **0.0** | **36** | **13.3** | **105** | **38.9** |
| District of Columbia | 270 | 96 | 35.6 | 2 | 0.7 | 31 | 11.5 | 0 | 0.0 | 36 | 13.3 | 105 | 38.9 |
| | | | | | | | | | | | | | |
| **FIRST CIRCUIT** | **1,725** | **825** | **47.8** | **12** | **0.7** | **129** | **7.5** | **2** | **0.1** | **82** | **4.8** | **675** | **39.1** |
| Maine | 117 | 50 | 42.7 | 0 | 0.0 | 23 | 19.7 | 0 | 0.0 | 5 | 4.3 | 39 | 33.3 |
| Massachusetts | 386 | 145 | 37.6 | 6 | 1.6 | 35 | 9.1 | 2 | 0.5 | 23 | 6.0 | 175 | 45.3 |
| New Hampshire | 200 | 61 | 30.5 | 0 | 0.0 | 35 | 17.5 | 0 | 0.0 | 8 | 4.0 | 96 | 48.0 |
| Puerto Rico | 922 | 547 | 59.3 | 4 | 0.4 | 28 | 3.0 | 0 | 0.0 | 46 | 5.0 | 297 | 32.2 |
| Rhode Island | 100 | 22 | 22.0 | 2 | 2.0 | 8 | 8.0 | 0 | 0.0 | 0 | 0.0 | 68 | 68.0 |
| | | | | | | | | | | | | | |
| **SECOND CIRCUIT** | **2,439** | **727** | **29.8** | **9** | **0.4** | **431** | **17.7** | **7** | **0.3** | **94** | **3.9** | **1,171** | **48.0** |
| Connecticut | 353 | 135 | 38.2 | 2 | 0.6 | 48 | 13.6 | 0 | 0.0 | 35 | 9.9 | 133 | 37.7 |
| New York | | | | | | | | | | | | | |
| Eastern | 360 | 93 | 25.8 | 2 | 0.6 | 73 | 20.3 | 1 | 0.3 | 32 | 8.9 | 159 | 44.2 |
| Northern | 297 | 153 | 51.5 | 2 | 0.7 | 51 | 17.2 | 0 | 0.0 | 3 | 1.0 | 88 | 29.6 |
| Southern | 924 | 168 | 18.2 | 0 | 0.0 | 163 | 17.6 | 6 | 0.6 | 21 | 2.3 | 566 | 61.3 |
| Western | 350 | 152 | 43.4 | 2 | 0.6 | 54 | 15.4 | 0 | 0.0 | 1 | 0.3 | 141 | 40.3 |
| Vermont | 155 | 26 | 16.8 | 1 | 0.6 | 42 | 27.1 | 0 | 0.0 | 2 | 1.3 | 84 | 54.2 |
| | | | | | | | | | | | | | |
| **THIRD CIRCUIT** | **1,927** | **815** | **42.3** | **8** | **0.4** | **349** | **18.1** | **9** | **0.5** | **46** | **2.4** | **700** | **36.3** |
| Delaware | 89 | 39 | 43.8 | 2 | 2.2 | 20 | 22.5 | 5 | 5.6 | 3 | 3.4 | 20 | 22.5 |
| New Jersey | 592 | 259 | 43.8 | 1 | 0.2 | 97 | 16.4 | 0 | 0.0 | 7 | 1.2 | 228 | 38.5 |
| Pennsylvania | | | | | | | | | | | | | |
| Eastern | 492 | 169 | 34.3 | 1 | 0.2 | 114 | 23.2 | 2 | 0.4 | 15 | 3.0 | 191 | 38.8 |
| Middle | 360 | 167 | 46.4 | 1 | 0.3 | 77 | 21.4 | 2 | 0.6 | 11 | 3.1 | 102 | 28.3 |
| Western | 357 | 151 | 42.3 | 3 | 0.8 | 39 | 10.9 | 0 | 0.0 | 8 | 2.2 | 156 | 43.7 |
| Virgin Islands | 37 | 30 | 81.1 | 0 | 0.0 | 2 | 5.4 | 0 | 0.0 | 2 | 5.4 | 3 | 8.1 |
| | | | | | | | | | | | | | |
| **FOURTH CIRCUIT** | **4,200** | **2,182** | **52.0** | **20** | **0.5** | **544** | **13.0** | **5** | **0.1** | **126** | **3.0** | **1,323** | **31.5** |
| Maryland | 456 | 153 | 33.6 | 4 | 0.9 | 66 | 14.5 | 0 | 0.0 | 45 | 9.9 | 188 | 41.2 |
| North Carolina | | | | | | | | | | | | | |
| Eastern | 665 | 365 | 54.9 | 3 | 0.5 | 155 | 23.3 | 0 | 0.0 | 12 | 1.8 | 130 | 19.5 |
| Middle | 404 | 225 | 55.7 | 3 | 0.7 | 34 | 8.4 | 0 | 0.0 | 9 | 2.2 | 133 | 32.9 |
| Western | 512 | 275 | 53.7 | 1 | 0.2 | 96 | 18.8 | 0 | 0.0 | 3 | 0.6 | 137 | 26.8 |
| South Carolina | 575 | 277 | 48.2 | 1 | 0.2 | 95 | 16.5 | 0 | 0.0 | 11 | 1.9 | 191 | 33.2 |
| Virginia | | | | | | | | | | | | | |
| Eastern | 805 | 486 | 60.4 | 6 | 0.7 | 33 | 4.1 | 0 | 0.0 | 36 | 4.5 | 244 | 30.3 |
| Western | 287 | 107 | 37.3 | 2 | 0.7 | 39 | 13.6 | 3 | 1.0 | 7 | 2.4 | 129 | 44.9 |
| West Virginia | | | | | | | | | | | | | |
| Northern | 235 | 138 | 58.7 | 0 | 0.0 | 18 | 7.7 | 2 | 0.9 | 1 | 0.4 | 76 | 32.3 |
| Southern | 261 | 156 | 59.8 | 0 | 0.0 | 8 | 3.1 | 0 | 0.0 | 2 | 0.8 | 95 | 36.4 |

## Table 30 (cont.)

| CIRCUIT District | TOTAL | WITHIN GUIDELINE RANGE | | DEPARTURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| **FIFTH CIRCUIT** | **20,196** | **13,910** | **68.9** | **59** | **0.3** | **713** | **3.5** | **1,356** | **6.7** | **857** | **4.2** | **3,301** | **16.3** |
| Louisiana | | | | | | | | | | | | | |
| Eastern | 177 | 106 | 59.9 | 0 | 0.0 | 28 | 15.8 | 0 | 0.0 | 4 | 2.3 | 39 | 22.0 |
| Middle | 120 | 71 | 59.2 | 0 | 0.0 | 20 | 16.7 | 0 | 0.0 | 1 | 0.8 | 28 | 23.3 |
| Western | 284 | 201 | 70.8 | 5 | 1.8 | 27 | 9.5 | 0 | 0.0 | 8 | 2.8 | 43 | 15.1 |
| Mississippi | | | | | | | | | | | | | |
| Northern | 130 | 65 | 50.0 | 0 | 0.0 | 26 | 20.0 | 0 | 0.0 | 1 | 0.8 | 38 | 29.2 |
| Southern | 386 | 234 | 60.6 | 0 | 0.0 | 25 | 6.5 | 31 | 8.0 | 3 | 0.8 | 93 | 24.1 |
| Texas | | | | | | | | | | | | | |
| Eastern | 698 | 494 | 70.8 | 3 | 0.4 | 20 | 2.9 | 1 | 0.1 | 6 | 0.9 | 174 | 24.9 |
| Northern | 1,377 | 888 | 64.5 | 8 | 0.6 | 152 | 11.0 | 0 | 0.0 | 29 | 2.1 | 300 | 21.8 |
| Southern | 8,535 | 5,170 | 60.6 | 38 | 0.4 | 257 | 3.0 | 1,104 | 12.9 | 595 | 7.0 | 1,371 | 16.1 |
| Western | 8,489 | 6,681 | 78.7 | 5 | 0.1 | 158 | 1.9 | 220 | 2.6 | 210 | 2.5 | 1,215 | 14.3 |
| | | | | | | | | | | | | | |
| **SIXTH CIRCUIT** | **4,134** | **1,831** | **44.3** | **20** | **0.5** | **739** | **17.9** | **8** | **0.2** | **211** | **5.1** | **1,325** | **32.1** |
| Kentucky | | | | | | | | | | | | | |
| Eastern | 431 | 249 | 57.8 | 3 | 0.7 | 62 | 14.4 | 0 | 0.0 | 5 | 1.2 | 112 | 26.0 |
| Western | 347 | 129 | 37.2 | 1 | 0.3 | 90 | 25.9 | 4 | 1.2 | 21 | 6.1 | 102 | 29.4 |
| Michigan | | | | | | | | | | | | | |
| Eastern | 528 | 231 | 43.8 | 2 | 0.4 | 57 | 10.8 | 0 | 0.0 | 9 | 1.7 | 229 | 43.4 |
| Western | 320 | 175 | 54.7 | 8 | 2.5 | 52 | 16.3 | 0 | 0.0 | 5 | 1.6 | 80 | 25.0 |
| Ohio | | | | | | | | | | | | | |
| Northern | 787 | 374 | 47.5 | 1 | 0.1 | 159 | 20.2 | 0 | 0.0 | 26 | 3.3 | 227 | 28.8 |
| Southern | 548 | 168 | 30.7 | 4 | 0.7 | 83 | 15.1 | 4 | 0.7 | 106 | 19.3 | 183 | 33.4 |
| Tennessee | | | | | | | | | | | | | |
| Eastern | 604 | 273 | 45.2 | 0 | 0.0 | 168 | 27.8 | 0 | 0.0 | 16 | 2.6 | 147 | 24.3 |
| Middle | 230 | 63 | 27.4 | 1 | 0.4 | 27 | 11.7 | 0 | 0.0 | 19 | 8.3 | 120 | 52.2 |
| Western | 339 | 169 | 49.9 | 0 | 0.0 | 41 | 12.1 | 0 | 0.0 | 4 | 1.2 | 125 | 36.9 |
| | | | | | | | | | | | | | |
| **SEVENTH CIRCUIT** | **2,268** | **883** | **38.9** | **3** | **0.1** | **246** | **10.8** | **0** | **0.0** | **98** | **4.3** | **1,038** | **45.8** |
| Illinois | | | | | | | | | | | | | |
| Central | 226 | 98 | 43.4 | 0 | 0.0 | 31 | 13.7 | 0 | 0.0 | 1 | 0.4 | 96 | 42.5 |
| Northern | 540 | 171 | 31.7 | 0 | 0.0 | 31 | 5.7 | 0 | 0.0 | 37 | 6.9 | 301 | 55.7 |
| Southern | 234 | 118 | 50.4 | 0 | 0.0 | 43 | 18.4 | 0 | 0.0 | 1 | 0.4 | 72 | 30.8 |
| Indiana | | | | | | | | | | | | | |
| Northern | 315 | 138 | 43.8 | 0 | 0.0 | 41 | 13.0 | 0 | 0.0 | 15 | 4.8 | 121 | 38.4 |
| Southern | 537 | 247 | 46.0 | 0 | 0.0 | 73 | 13.6 | 0 | 0.0 | 4 | 0.7 | 213 | 39.7 |
| Wisconsin | | | | | | | | | | | | | |
| Eastern | 265 | 56 | 21.1 | 0 | 0.0 | 19 | 7.2 | 0 | 0.0 | 2 | 0.8 | 188 | 70.9 |
| Western | 151 | 55 | 36.4 | 3 | 2.0 | 8 | 5.3 | 0 | 0.0 | 38 | 25.2 | 47 | 31.1 |
| | | | | | | | | | | | | | |
| **EIGHTH CIRCUIT** | **4,691** | **2,073** | **44.2** | **31** | **0.7** | **469** | **10.0** | **47** | **1.0** | **103** | **2.2** | **1,968** | **42.0** |
| Arkansas | | | | | | | | | | | | | |
| Eastern | 474 | 271 | 57.2 | 0 | 0.0 | 12 | 2.5 | 0 | 0.0 | 5 | 1.1 | 186 | 39.2 |
| Western | 247 | 116 | 47.0 | 0 | 0.0 | 33 | 13.4 | 0 | 0.0 | 0 | 0.0 | 98 | 39.7 |
| Iowa | | | | | | | | | | | | | |
| Northern | 365 | 179 | 49.0 | 13 | 3.6 | 54 | 14.8 | 0 | 0.0 | 6 | 1.6 | 113 | 31.0 |
| Southern | 421 | 156 | 37.1 | 0 | 0.0 | 59 | 14.0 | 0 | 0.0 | 5 | 1.2 | 201 | 47.7 |
| Minnesota | 334 | 93 | 27.8 | 2 | 0.6 | 54 | 16.2 | 8 | 2.4 | 15 | 4.5 | 162 | 48.5 |
| Missouri | | | | | | | | | | | | | |
| Eastern | 925 | 352 | 38.1 | 1 | 0.1 | 57 | 6.2 | 0 | 0.0 | 12 | 1.3 | 503 | 54.4 |
| Western | 695 | 287 | 41.3 | 4 | 0.6 | 90 | 12.9 | 0 | 0.0 | 20 | 2.9 | 294 | 42.3 |
| Nebraska | 482 | 233 | 48.3 | 0 | 0.0 | 12 | 2.5 | 35 | 7.3 | 3 | 0.6 | 199 | 41.3 |
| North Dakota | 252 | 88 | 34.9 | 4 | 1.6 | 89 | 35.3 | 3 | 1.2 | 4 | 1.6 | 64 | 25.4 |
| South Dakota | 496 | 298 | 60.1 | 7 | 1.4 | 9 | 1.8 | 1 | 0.2 | 33 | 6.7 | 148 | 29.8 |

## Table 30 (cont.)

| CIRCUIT District | TOTAL | WITHIN GUIDELINE RANGE N | % | DEPARTURE UPWARD N | % | §5K1.1 N | % | §5K3.1 N | % | DOWNWARD N | % | VARIANCE N | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NINTH CIRCUIT** | **11,949** | **3,361** | **28.1** | **50** | **0.4** | **793** | **6.6** | **4,636** | **38.8** | **490** | **4.1** | **2,619** | **21.9** |
| Alaska | 108 | 28 | 25.9 | 0 | 0.0 | 9 | 8.3 | 0 | 0.0 | 1 | 0.9 | 70 | 64.8 |
| Arizona | 4,511 | 1,629 | 36.1 | 17 | 0.4 | 74 | 1.6 | 2,389 | 53.0 | 48 | 1.1 | 354 | 7.8 |
| California | | | | | | | | | | | | | |
| Central | 909 | 265 | 29.2 | 4 | 0.4 | 128 | 14.1 | 37 | 4.1 | 81 | 8.9 | 394 | 43.3 |
| Eastern | 398 | 156 | 39.2 | 0 | 0.0 | 64 | 16.1 | 10 | 2.5 | 6 | 1.5 | 162 | 40.7 |
| Northern | 552 | 141 | 25.5 | 0 | 0.0 | 41 | 7.4 | 4 | 0.7 | 14 | 2.5 | 352 | 63.8 |
| Southern | 3,495 | 459 | 13.1 | 29 | 0.8 | 181 | 5.2 | 2,131 | 61.0 | 296 | 8.5 | 399 | 11.4 |
| Guam | 42 | 24 | 57.1 | 0 | 0.0 | 8 | 19.0 | 0 | 0.0 | 0 | 0.0 | 10 | 23.8 |
| Hawaii | 124 | 58 | 46.8 | 0 | 0.0 | 34 | 27.4 | 0 | 0.0 | 0 | 0.0 | 32 | 25.8 |
| Idaho | 321 | 146 | 45.5 | 0 | 0.0 | 57 | 17.8 | 18 | 5.6 | 6 | 1.9 | 94 | 29.3 |
| Montana | 323 | 115 | 35.6 | 0 | 0.0 | 85 | 26.3 | 1 | 0.3 | 4 | 1.2 | 118 | 36.5 |
| Nevada | 292 | 74 | 25.3 | 0 | 0.0 | 16 | 5.5 | 12 | 4.1 | 21 | 7.2 | 169 | 57.9 |
| Northern Mariana Islands | 10 | 7 | 70.0 | 0 | 0.0 | 1 | 10.0 | 0 | 0.0 | 0 | 0.0 | 2 | 20.0 |
| Oregon | 362 | 87 | 24.0 | 0 | 0.0 | 46 | 12.7 | 0 | 0.0 | 8 | 2.2 | 221 | 61.0 |
| Washington | | | | | | | | | | | | | |
| Eastern | 237 | 87 | 36.7 | 0 | 0.0 | 36 | 15.2 | 15 | 6.3 | 4 | 1.7 | 95 | 40.1 |
| Western | 265 | 85 | 32.1 | 0 | 0.0 | 13 | 4.9 | 19 | 7.2 | 1 | 0.4 | 147 | 55.5 |
| **TENTH CIRCUIT** | **5,544** | **3,062** | **55.2** | **29** | **0.5** | **281** | **5.1** | **819** | **14.8** | **323** | **5.8** | **1,030** | **18.6** |
| Colorado | 393 | 159 | 40.5 | 0 | 0.0 | 60 | 15.3 | 41 | 10.4 | 7 | 1.8 | 126 | 32.1 |
| Kansas | 307 | 127 | 41.4 | 0 | 0.0 | 54 | 17.6 | 8 | 2.6 | 12 | 3.9 | 106 | 34.5 |
| New Mexico | 3,189 | 2,114 | 66.3 | 5 | 0.2 | 39 | 1.2 | 630 | 19.8 | 133 | 4.2 | 268 | 8.4 |
| Oklahoma | | | | | | | | | | | | | |
| Eastern | 105 | 66 | 62.9 | 0 | 0.0 | 10 | 9.5 | 0 | 0.0 | 0 | 0.0 | 29 | 27.6 |
| Northern | 239 | 96 | 40.2 | 15 | 6.3 | 32 | 13.4 | 0 | 0.0 | 40 | 16.7 | 56 | 23.4 |
| Western | 471 | 234 | 49.7 | 0 | 0.0 | 25 | 5.3 | 3 | 0.6 | 11 | 2.3 | 198 | 42.0 |
| Utah | 681 | 200 | 29.4 | 7 | 1.0 | 48 | 7.0 | 125 | 18.4 | 116 | 17.0 | 185 | 27.2 |
| Wyoming | 159 | 66 | 41.5 | 2 | 1.3 | 13 | 8.2 | 12 | 7.5 | 4 | 2.5 | 62 | 39.0 |
| **ELEVENTH CIRCUIT** | **4,890** | **2,593** | **53.0** | **18** | **0.4** | **545** | **11.1** | **29** | **0.6** | **68** | **1.4** | **1,637** | **33.5** |
| Alabama | | | | | | | | | | | | | |
| Middle | 140 | 72 | 51.4 | 0 | 0.0 | 23 | 16.4 | 0 | 0.0 | 1 | 0.7 | 44 | 31.4 |
| Northern | 448 | 234 | 52.2 | 1 | 0.2 | 70 | 15.6 | 0 | 0.0 | 8 | 1.8 | 135 | 30.1 |
| Southern | 301 | 166 | 55.1 | 5 | 1.7 | 50 | 16.6 | 1 | 0.3 | 7 | 2.3 | 72 | 23.9 |
| Florida | | | | | | | | | | | | | |
| Middle | 1,220 | 606 | 49.7 | 6 | 0.5 | 163 | 13.4 | 17 | 1.4 | 12 | 1.0 | 416 | 34.1 |
| Northern | 273 | 153 | 56.0 | 1 | 0.4 | 36 | 13.2 | 7 | 2.6 | 4 | 1.5 | 72 | 26.4 |
| Southern | 1,271 | 649 | 51.1 | 3 | 0.2 | 72 | 5.7 | 3 | 0.2 | 19 | 1.5 | 525 | 41.3 |
| Georgia | | | | | | | | | | | | | |
| Middle | 347 | 246 | 70.9 | 1 | 0.3 | 30 | 8.6 | 0 | 0.0 | 1 | 0.3 | 69 | 19.9 |
| Northern | 482 | 183 | 38.0 | 0 | 0.0 | 31 | 6.4 | 0 | 0.0 | 12 | 2.5 | 256 | 53.1 |
| Southern | 408 | 284 | 69.6 | 1 | 0.2 | 70 | 17.2 | 1 | 0.2 | 4 | 1.0 | 48 | 11.8 |

---

[1] Of the 64,565 cases, 332 were excluded because information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range. Descriptions of variables used in this table are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2020 Datafile, USSCFY20.

# Exhibit M

**Table 30**

**SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE**
**IN EACH CIRCUIT AND DISTRICT[1]**
**Fiscal Year 2021**

| CIRCUIT | | WITHIN GUIDELINE RANGE | | | | DEPARTURE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
| District | TOTAL | N | % | N | % | N | % | N | % | N | % | N | % |
| TOTAL | 57,041 | 24,434 | 42.8 | 296 | 0.5 | 5,493 | 9.6 | 6,387 | 11.2 | 2,762 | 4.8 | 17,669 | 31.0 |
| | | | | | | | | | | | | | |
| D.C. CIRCUIT | 252 | 73 | 29.0 | 1 | 0.4 | 31 | 12.3 | 0 | 0.0 | 20 | 7.9 | 127 | 50.4 |
| District of Columbia | 252 | 73 | 29.0 | 1 | 0.4 | 31 | 12.3 | 0 | 0.0 | 20 | 7.9 | 127 | 50.4 |
| | | | | | | | | | | | | | |
| FIRST CIRCUIT | 1,775 | 650 | 36.6 | 8 | 0.5 | 145 | 8.2 | 1 | 0.1 | 92 | 5.2 | 879 | 49.5 |
| Maine | 199 | 32 | 16.1 | 1 | 0.5 | 37 | 18.6 | 0 | 0.0 | 5 | 2.5 | 124 | 62.3 |
| Massachusetts | 421 | 112 | 26.6 | 4 | 1.0 | 32 | 7.6 | 1 | 0.2 | 34 | 8.1 | 238 | 56.5 |
| New Hampshire | 197 | 45 | 22.8 | 0 | 0.0 | 23 | 11.7 | 0 | 0.0 | 8 | 4.1 | 121 | 61.4 |
| Puerto Rico | 883 | 448 | 50.7 | 3 | 0.3 | 49 | 5.5 | 0 | 0.0 | 45 | 5.1 | 338 | 38.3 |
| Rhode Island | 75 | 13 | 17.3 | 0 | 0.0 | 4 | 5.3 | 0 | 0.0 | 0 | 0.0 | 58 | 77.3 |
| | | | | | | | | | | | | | |
| SECOND CIRCUIT | 2,416 | 655 | 27.1 | 5 | 0.2 | 375 | 15.5 | 5 | 0.2 | 95 | 3.9 | 1,281 | 53.0 |
| Connecticut | 301 | 78 | 25.9 | 1 | 0.3 | 32 | 10.6 | 0 | 0.0 | 46 | 15.3 | 144 | 47.8 |
| New York | | | | | | | | | | | | | |
| Eastern | 498 | 123 | 24.7 | 1 | 0.2 | 95 | 19.1 | 2 | 0.4 | 30 | 6.0 | 247 | 49.6 |
| Northern | 229 | 113 | 49.3 | 1 | 0.4 | 50 | 21.8 | 0 | 0.0 | 5 | 2.2 | 60 | 26.2 |
| Southern | 943 | 187 | 19.8 | 1 | 0.1 | 114 | 12.1 | 3 | 0.3 | 10 | 1.1 | 628 | 66.6 |
| Western | 321 | 125 | 38.9 | 1 | 0.3 | 63 | 19.6 | 0 | 0.0 | 2 | 0.6 | 130 | 40.5 |
| Vermont | 124 | 29 | 23.4 | 0 | 0.0 | 21 | 16.9 | 0 | 0.0 | 2 | 1.6 | 72 | 58.1 |
| | | | | | | | | | | | | | |
| THIRD CIRCUIT | 1,899 | 764 | 40.2 | 5 | 0.3 | 338 | 17.8 | 7 | 0.4 | 43 | 2.3 | 742 | 39.1 |
| Delaware | 52 | 18 | 34.6 | 1 | 1.9 | 12 | 23.1 | 1 | 1.9 | 1 | 1.9 | 19 | 36.5 |
| New Jersey | 628 | 270 | 43.0 | 1 | 0.2 | 91 | 14.5 | 0 | 0.0 | 6 | 1.0 | 260 | 41.4 |
| Pennsylvania | | | | | | | | | | | | | |
| Eastern | 446 | 150 | 33.6 | 0 | 0.0 | 106 | 23.8 | 4 | 0.9 | 16 | 3.6 | 170 | 38.1 |
| Middle | 310 | 126 | 40.6 | 0 | 0.0 | 71 | 22.9 | 2 | 0.6 | 9 | 2.9 | 102 | 32.9 |
| Western | 407 | 159 | 39.1 | 2 | 0.5 | 53 | 13.0 | 0 | 0.0 | 10 | 2.5 | 183 | 45.0 |
| Virgin Islands | 56 | 41 | 73.2 | 1 | 1.8 | 5 | 8.9 | 0 | 0.0 | 1 | 1.8 | 8 | 14.3 |
| | | | | | | | | | | | | | |
| FOURTH CIRCUIT | 4,452 | 2,194 | 49.3 | 34 | 0.8 | 582 | 13.1 | 1 | 0.0 | 129 | 2.9 | 1,512 | 34.0 |
| Maryland | 513 | 175 | 34.1 | 11 | 2.1 | 61 | 11.9 | 0 | 0.0 | 45 | 8.8 | 221 | 43.1 |
| North Carolina | | | | | | | | | | | | | |
| Eastern | 885 | 486 | 54.9 | 9 | 1.0 | 215 | 24.3 | 0 | 0.0 | 11 | 1.2 | 164 | 18.5 |
| Middle | 361 | 172 | 47.6 | 3 | 0.8 | 40 | 11.1 | 0 | 0.0 | 7 | 1.9 | 139 | 38.5 |
| Western | 502 | 270 | 53.8 | 1 | 0.2 | 71 | 14.1 | 0 | 0.0 | 4 | 0.8 | 156 | 31.1 |
| South Carolina | 530 | 214 | 40.4 | 1 | 0.2 | 103 | 19.4 | 0 | 0.0 | 17 | 3.2 | 195 | 36.8 |
| Virginia | | | | | | | | | | | | | |
| Eastern | 957 | 523 | 54.6 | 8 | 0.8 | 39 | 4.1 | 0 | 0.0 | 28 | 2.9 | 359 | 37.5 |
| Western | 235 | 101 | 43.0 | 0 | 0.0 | 38 | 16.2 | 0 | 0.0 | 12 | 5.1 | 84 | 35.7 |
| West Virginia | | | | | | | | | | | | | |
| Northern | 250 | 144 | 57.6 | 0 | 0.0 | 13 | 5.2 | 1 | 0.4 | 1 | 0.4 | 91 | 36.4 |
| Southern | 219 | 109 | 49.8 | 1 | 0.5 | 2 | 0.9 | 0 | 0.0 | 4 | 1.8 | 103 | 47.0 |

**Table 30 (cont.)**

| CIRCUIT | | WITHIN GUIDELINE RANGE | | DEPARTURE | | | | | | | | | |
| District | TOTAL | N | % | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | VARIANCE | |
| | | | | N | % | N | % | N | % | N | % | N | % |
| **FIFTH CIRCUIT** | **16,374** | **9,786** | **59.8** | **61** | **0.4** | **831** | **5.1** | **1,470** | **9.0** | **952** | **5.8** | **3,274** | **20.0** |
| Louisiana | | | | | | | | | | | | | |
| Eastern | 199 | 121 | 60.8 | 1 | 0.5 | 21 | 10.6 | 0 | 0.0 | 1 | 0.5 | 55 | 27.6 |
| Middle | 103 | 51 | 49.5 | 0 | 0.0 | 22 | 21.4 | 0 | 0.0 | 2 | 1.9 | 28 | 27.2 |
| Western | 234 | 137 | 58.5 | 4 | 1.7 | 19 | 8.1 | 0 | 0.0 | 10 | 4.3 | 64 | 27.4 |
| Mississippi | | | | | | | | | | | | | |
| Northern | 79 | 31 | 39.2 | 1 | 1.3 | 11 | 13.9 | 0 | 0.0 | 1 | 1.3 | 35 | 44.3 |
| Southern | 262 | 168 | 64.1 | 1 | 0.4 | 22 | 8.4 | 9 | 3.4 | 2 | 0.8 | 60 | 22.9 |
| Texas | | | | | | | | | | | | | |
| Eastern | 662 | 425 | 64.2 | 7 | 1.1 | 25 | 3.8 | 0 | 0.0 | 13 | 2.0 | 192 | 29.0 |
| Northern | 1,547 | 912 | 59.0 | 17 | 1.1 | 168 | 10.9 | 1 | 0.1 | 17 | 1.1 | 432 | 27.9 |
| Southern | 8,046 | 3,977 | 49.4 | 27 | 0.3 | 341 | 4.2 | 1,352 | 16.8 | 779 | 9.7 | 1,570 | 19.5 |
| Western | 5,242 | 3,964 | 75.6 | 3 | 0.1 | 202 | 3.9 | 108 | 2.1 | 127 | 2.4 | 838 | 16.0 |
| **SIXTH CIRCUIT** | **3,997** | **1,616** | **40.4** | **11** | **0.3** | **749** | **18.7** | **9** | **0.2** | **160** | **4.0** | **1,452** | **36.3** |
| Kentucky | | | | | | | | | | | | | |
| Eastern | 427 | 216 | 50.6 | 3 | 0.7 | 78 | 18.3 | 0 | 0.0 | 2 | 0.5 | 128 | 30.0 |
| Western | 275 | 97 | 35.3 | 3 | 1.1 | 75 | 27.3 | 7 | 2.5 | 14 | 5.1 | 79 | 28.7 |
| Michigan | | | | | | | | | | | | | |
| Eastern | 488 | 183 | 37.5 | 0 | 0.0 | 29 | 5.9 | 1 | 0.2 | 17 | 3.5 | 258 | 52.9 |
| Western | 291 | 161 | 55.3 | 0 | 0.0 | 59 | 20.3 | 0 | 0.0 | 10 | 3.4 | 61 | 21.0 |
| Ohio | | | | | | | | | | | | | |
| Northern | 817 | 338 | 41.4 | 0 | 0.0 | 161 | 19.7 | 0 | 0.0 | 15 | 1.8 | 303 | 37.1 |
| Southern | 506 | 133 | 26.3 | 2 | 0.4 | 111 | 21.9 | 1 | 0.2 | 72 | 14.2 | 187 | 37.0 |
| Tennessee | | | | | | | | | | | | | |
| Eastern | 581 | 272 | 46.8 | 3 | 0.5 | 152 | 26.2 | 0 | 0.0 | 6 | 1.0 | 148 | 25.5 |
| Middle | 249 | 51 | 20.5 | 0 | 0.0 | 31 | 12.4 | 0 | 0.0 | 15 | 6.0 | 152 | 61.0 |
| Western | 363 | 165 | 45.5 | 0 | 0.0 | 53 | 14.6 | 0 | 0.0 | 9 | 2.5 | 136 | 37.5 |
| **SEVENTH CIRCUIT** | **2,221** | **856** | **38.5** | **5** | **0.2** | **199** | **9.0** | **1** | **0.0** | **106** | **4.8** | **1,054** | **47.5** |
| Illinois | | | | | | | | | | | | | |
| Central | 231 | 84 | 36.4 | 2 | 0.9 | 19 | 8.2 | 0 | 0.0 | 2 | 0.9 | 124 | 53.7 |
| Northern | 619 | 202 | 32.6 | 2 | 0.3 | 34 | 5.5 | 1 | 0.2 | 45 | 7.3 | 335 | 54.1 |
| Southern | 221 | 121 | 54.8 | 0 | 0.0 | 27 | 12.2 | 0 | 0.0 | 2 | 0.9 | 71 | 32.1 |
| Indiana | | | | | | | | | | | | | |
| Northern | 342 | 178 | 52.0 | 0 | 0.0 | 36 | 10.5 | 0 | 0.0 | 5 | 1.5 | 123 | 36.0 |
| Southern | 413 | 190 | 46.0 | 0 | 0.0 | 50 | 12.1 | 0 | 0.0 | 4 | 1.0 | 169 | 40.9 |
| Wisconsin | | | | | | | | | | | | | |
| Eastern | 263 | 44 | 16.7 | 0 | 0.0 | 28 | 10.6 | 0 | 0.0 | 11 | 4.2 | 180 | 68.4 |
| Western | 132 | 37 | 28.0 | 1 | 0.8 | 5 | 3.8 | 0 | 0.0 | 37 | 28.0 | 52 | 39.4 |
| **EIGHTH CIRCUIT** | **4,583** | **1,917** | **41.8** | **40** | **0.9** | **521** | **11.4** | **29** | **0.6** | **88** | **1.9** | **1,988** | **43.4** |
| Arkansas | | | | | | | | | | | | | |
| Eastern | 541 | 326 | 60.3 | 1 | 0.2 | 28 | 5.2 | 0 | 0.0 | 4 | 0.7 | 182 | 33.6 |
| Western | 185 | 71 | 38.4 | 1 | 0.5 | 25 | 13.5 | 0 | 0.0 | 1 | 0.5 | 87 | 47.0 |
| Iowa | | | | | | | | | | | | | |
| Northern | 326 | 136 | 41.7 | 19 | 5.8 | 77 | 23.6 | 0 | 0.0 | 4 | 1.2 | 90 | 27.6 |
| Southern | 495 | 164 | 33.1 | 1 | 0.2 | 78 | 15.8 | 1 | 0.2 | 3 | 0.6 | 248 | 50.1 |
| Minnesota | 257 | 60 | 23.3 | 2 | 0.8 | 40 | 15.6 | 6 | 2.3 | 14 | 5.4 | 135 | 52.5 |
| Missouri | | | | | | | | | | | | | |
| Eastern | 1,065 | 418 | 39.2 | 2 | 0.2 | 85 | 8.0 | 1 | 0.1 | 5 | 0.5 | 554 | 52.0 |
| Western | 581 | 228 | 39.2 | 2 | 0.3 | 69 | 11.9 | 0 | 0.0 | 9 | 1.5 | 273 | 47.0 |
| Nebraska | 379 | 181 | 47.8 | 1 | 0.3 | 6 | 1.6 | 14 | 3.7 | 6 | 1.6 | 171 | 45.1 |
| North Dakota | 289 | 100 | 34.6 | 8 | 2.8 | 110 | 38.1 | 6 | 2.1 | 4 | 1.4 | 61 | 21.1 |
| South Dakota | 465 | 233 | 50.1 | 3 | 0.6 | 3 | 0.6 | 1 | 0.2 | 38 | 8.2 | 187 | 40.2 |

## Table 30 (cont.)

| CIRCUIT | | WITHIN GUIDELINE RANGE | | DEPARTURE | | | | | | | | VARIANCE | |
| | | | | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | | |
| District | TOTAL | N | % | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **NINTH CIRCUIT** | **10,959** | **2,518** | **23.0** | **80** | **0.7** | **780** | **7.1** | **4,445** | **40.6** | **465** | **4.2** | **2,671** | **24.4** |
| Alaska | 148 | 29 | 19.6 | 2 | 1.4 | 21 | 14.2 | 0 | 0.0 | 4 | 2.7 | 92 | 62.2 |
| Arizona | 4,349 | 1,221 | 28.1 | 16 | 0.4 | 68 | 1.6 | 2,489 | 57.2 | 101 | 2.3 | 454 | 10.4 |
| California | | | | | | | | | | | | | |
|   Central | 861 | 210 | 24.4 | 1 | 0.1 | 95 | 11.0 | 40 | 4.6 | 72 | 8.4 | 443 | 51.5 |
|   Eastern | 279 | 103 | 36.9 | 2 | 0.7 | 54 | 19.4 | 2 | 0.7 | 6 | 2.2 | 112 | 40.1 |
|   Northern | 369 | 63 | 17.1 | 1 | 0.3 | 36 | 9.8 | 2 | 0.5 | 14 | 3.8 | 253 | 68.6 |
|   Southern | 2,923 | 282 | 9.6 | 49 | 1.7 | 165 | 5.6 | 1,855 | 63.5 | 227 | 7.8 | 345 | 11.8 |
| Guam | 37 | 18 | 48.6 | 0 | 0.0 | 13 | 35.1 | 0 | 0.0 | 1 | 2.7 | 5 | 13.5 |
| Hawaii | 168 | 63 | 37.5 | 0 | 0.0 | 49 | 29.2 | 0 | 0.0 | 0 | 0.0 | 56 | 33.3 |
| Idaho | 241 | 95 | 39.4 | 2 | 0.8 | 54 | 22.4 | 5 | 2.1 | 8 | 3.3 | 77 | 32.0 |
| Montana | 333 | 100 | 30.0 | 3 | 0.9 | 90 | 27.0 | 0 | 0.0 | 11 | 3.3 | 129 | 38.7 |
| Nevada | 295 | 61 | 20.7 | 0 | 0.0 | 19 | 6.4 | 42 | 14.2 | 6 | 2.0 | 167 | 56.6 |
| Northern Mariana Islands | 16 | 12 | 75.0 | 0 | 0.0 | 2 | 12.5 | 0 | 0.0 | 0 | 0.0 | 2 | 12.5 |
| Oregon | 387 | 60 | 15.5 | 1 | 0.3 | 53 | 13.7 | 0 | 0.0 | 7 | 1.8 | 266 | 68.7 |
| Washington | | | | | | | | | | | | | |
|   Eastern | 199 | 49 | 24.6 | 3 | 1.5 | 54 | 27.1 | 3 | 1.5 | 6 | 3.0 | 84 | 42.2 |
|   Western | 354 | 152 | 42.9 | 0 | 0.0 | 7 | 2.0 | 7 | 2.0 | 2 | 0.6 | 186 | 52.5 |
| **TENTH CIRCUIT** | **3,831** | **1,437** | **37.5** | **33** | **0.9** | **327** | **8.5** | **409** | **10.7** | **438** | **11.4** | **1,187** | **31.0** |
| Colorado | 370 | 127 | 34.3 | 0 | 0.0 | 74 | 20.0 | 18 | 4.9 | 12 | 3.2 | 139 | 37.6 |
| Kansas | 405 | 172 | 42.5 | 2 | 0.5 | 51 | 12.6 | 6 | 1.5 | 8 | 2.0 | 166 | 41.0 |
| New Mexico | 1,411 | 581 | 41.2 | 8 | 0.6 | 40 | 2.8 | 299 | 21.2 | 181 | 12.8 | 302 | 21.4 |
| Oklahoma | | | | | | | | | | | | | |
|   Eastern | 89 | 49 | 55.1 | 0 | 0.0 | 12 | 13.5 | 0 | 0.0 | 2 | 2.2 | 26 | 29.2 |
|   Northern | 320 | 118 | 36.9 | 19 | 5.9 | 37 | 11.6 | 0 | 0.0 | 97 | 30.3 | 49 | 15.3 |
|   Western | 407 | 202 | 49.6 | 0 | 0.0 | 29 | 7.1 | 0 | 0.0 | 3 | 0.7 | 173 | 42.5 |
| Utah | 658 | 131 | 19.9 | 4 | 0.6 | 68 | 10.3 | 77 | 11.7 | 130 | 19.8 | 248 | 37.7 |
| Wyoming | 171 | 57 | 33.3 | 0 | 0.0 | 16 | 9.4 | 9 | 5.3 | 5 | 2.9 | 84 | 49.1 |
| **ELEVENTH CIRCUIT** | **4,282** | **1,968** | **46.0** | **13** | **0.3** | **615** | **14.4** | **10** | **0.2** | **174** | **4.1** | **1,502** | **35.1** |
| Alabama | | | | | | | | | | | | | |
|   Middle | 122 | 46 | 37.7 | 0 | 0.0 | 29 | 23.8 | 0 | 0.0 | 1 | 0.8 | 46 | 37.7 |
|   Northern | 443 | 226 | 51.0 | 0 | 0.0 | 91 | 20.5 | 0 | 0.0 | 9 | 2.0 | 117 | 26.4 |
|   Southern | 228 | 106 | 46.5 | 0 | 0.0 | 57 | 25.0 | 0 | 0.0 | 2 | 0.9 | 63 | 27.6 |
| Florida | | | | | | | | | | | | | |
|   Middle | 1,065 | 440 | 41.3 | 4 | 0.4 | 165 | 15.5 | 3 | 0.3 | 8 | 0.8 | 445 | 41.8 |
|   Northern | 259 | 91 | 35.1 | 1 | 0.4 | 65 | 25.1 | 6 | 2.3 | 3 | 1.2 | 93 | 35.9 |
|   Southern | 797 | 356 | 44.7 | 2 | 0.3 | 63 | 7.9 | 1 | 0.1 | 13 | 1.6 | 362 | 45.4 |
| Georgia | | | | | | | | | | | | | |
|   Middle | 381 | 193 | 50.7 | 0 | 0.0 | 39 | 10.2 | 0 | 0.0 | 114 | 29.9 | 35 | 9.2 |
|   Northern | 544 | 184 | 33.8 | 5 | 0.9 | 47 | 8.6 | 0 | 0.0 | 12 | 2.2 | 296 | 54.4 |
|   Southern | 443 | 326 | 73.6 | 1 | 0.2 | 59 | 13.3 | 0 | 0.0 | 12 | 2.7 | 45 | 10.2 |

[1] Of the 57,287 cases, 246 were excluded because information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range.  Descriptions of variables used in this table are provided in Appendix A.

SOURCE:  U.S. Sentencing Commission, 2021 Datafile, USSCFY21.

# Exhibit N

P6536453

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

## PRESENTENCE INVESTIGATION REPORT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Docket No.: 0208 1:19CR00610- 001** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| | ) | |
| **Aviram Azari** | ) | **Sentence Date: 10/19/2022** |
| | ) | |

**Prepared for:**      Honorable John G. Koeltl
U.S. District Judge

**Prepared by:**      Jill Spitalieri
USPO
(212) 805-5061
Jill_Spitalieri@nysp.uscourts.gov

**Assistant U.S. Attorneys**
Olga Zverovich and Juliana Murray
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2514
olga.zverovich@usdoj.gov
(212) 637-2314
juliana.murray@usdoj.gov

**Defense Counsel**
Barry Zone
405 Lexington Avenue
New York, NY 10174
(212) 554-7864
bzone@mosessinger.com

**Offense:**      **Count 1**:
Conspiracy to Commit Computer Hacking
18 U.S.C. §§ 371, 1030(a)(2)(C), 1030(c)(2)(B)
Not more than 5 years' imprisonment/ Up to 3 years' supervised
release/ $250,000 fine or twice the loss/pecuniary gain from the offense/
$100 special assessment
(Class D Felony)

**Date Report Prepared: 6/14/2022**      **Date Report Revised:  7/12/2022**

**Count 3**:
Wire Fraud
18 U.S.C. §§ 1343 and 2
Not more than 20 years' imprisonment/Up to 3 years' supervised
release/ $250,000 fine or twice the loss/pecuniary gain from the offense/
$100 special assessment
(Class C Felony)

**Count 4**:
Aggravated Identity Theft
18 U.S.C. §§ 1028A(a)(1), 1028A(b), and § 2
2 years' imprisonment consecutive to all other counts/ Up to 1 year of
supervised release/ $250,000 fine or twice the loss/pecuniary gain from
the offense/ $100 special assessment
(Class E Felony)

**Release Status:**    In continuous custody since September 29, 2019.

**Detainers:**    None.

**Codefendants:**    None.

**Related Cases:**    None.

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | August 16, 1971 |
| **Age:** | 50 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |



| | |
|---|---|
| **SSN#:** | None. |
| **FBI#:** | 92AHRCD5J |
| **USM#:** | 87216-054 |
| **State ID#:** | 028594778 |
| **Alternate IDs:** | None. |
| **ICE#:** | A213235780 |

| | |
|---|---|
| **Education:** | High School Diploma |
| **Dependents:** | 3 |
| **Citizenship:** | Citizen of Another Country |
| **Immigration Status:** | Temporary Visa |

| | |
|---|---|
| **Address:** | Moran Street 49 |
| | Kiryat Yam, Israel |

| | |
|---|---|
| **Alias(es):** | None. |

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

## PART A. THE OFFENSE

### Charges(s) and Conviction(s)

1.  Four-count Indictment S1 19 CR 610 (JGK) was filed in the Southern District of New York on August 27, 2019.

2.  <u>Count One</u> charges that from at least November 2014 through at least 2019, in the Southern District of New York, AVIRAM AZARI and others conspired to commit computer hacking, in violation of 18 U.S.C. §§1030(a)(2)(C) and (c)(2)(B). It was part of this conspiracy that AZARI and others obtained information from a protected computer containing the contents of personal and business electronic accounts, for the purposes of commercial advantage and private financial gain, and the value of which information exceeded $5,000, in violation of 18 U.S.C. §§1030(a)(2)(C), (c)(2)(B)(i), and (iii).

(18 U.S.C. § 371)

3.  <u>Count Two</u> charges that from at least November 2014 through at least 2019, AVIRAM AZARI and others conspired to perpetrate a scheme targeting hundreds of victims, located in the Southern District of New York and elsewhere, by sending false and fraudulent emails to those victims, in order to trick the victims into entering their usernames and passwords to their electronic accounts into false and fraudulent websites controlled by AZARI and others, for the purpose of obtaining unauthorized access to those electronic accounts, and in furtherance thereof caused to be transmitted interstate and foreign email and wires through the Southern District of New York.

(18 U.S.C. § 1349)

4.  <u>Count Three</u> charges that from at least November 2014 through at least 2019, in the Southern District of New York, AVIRAM AZARI made and caused to be made false and fraudulent emails sent to hundreds of victims located in the Southern District of New York and elsewhere, in order to trick the victims into entering their usernames and passwords to their electronic accounts into false and fraudulent websites controlled by AZARI and others, for the purpose of obtaining unauthorized access to those electronic accounts.

(18 U.S.C. §§ 1343 and 2)

5.  <u>Count Four</u> charges that from at least November 2014 through at least 2019, in the Southern District of New York, AVIRAM AZARI possessed and used, and aided and abetted the possession and use of, login credentials including usernames and passwords of various individuals during and in relation to the wire fraud offenses charged in Counts Two and Three of this Indictment.

(18 U.S.C. §§ 1028A(a)(1), (b)), and 2)

Azari, Aviram                           4                    P6536453 - Spitalieri, Jill

6.    Forfeiture Allegation: As the result of committing the conduct alleged in Count 1 of this
      Indictment, AZARI shall forfeit to the U.S., pursuant to 18 U.S.C. 981(a)(1)(C) and 28
      U.S.C. 2461, all property, real and personal, that constitutes or is derived, directly and
      indirectly, from gross proceeds traceable to the commission of said offenses. There is also
      a Substitute Assets Provisions.

                        (18 U.S.C. § 981 and 28 U.S.C. § 2461)

7.    On April 20, 2022, AZARI appeared before the Honorable John G. Koeltl in the Southern
      District of New York and pled guilty as charged in Counts One, Three, and Four.
      Sentencing is scheduled for October 19, 2022.

8.    According to a written plea agreement, the parties have agreed to the following:

      i)   Offense Level

           (1) The applicable Guidelines manual is the November 1, 2018 manual.

           (2) Count One

               (a) Pursuant to USSG §2X1.1(a), the offense level is the base offense level from
                   the guideline for the substantive offense, plus any adjustments from such
                   guideline for any intended offense conduct that can be established with
                   reasonable certainty.

               (b) Pursuant to USSG §2B1.1(a)(2), the base offense level is six.

               (c) Pursuant to USSG §2B1.1(a)(1)(J), the offense level is increased by 18 levels,
                   because the loss was more than $3,500,000, but less than $9,500,000.

               (d) Pursuant to USSG §2B1.1(b)(2)(A)(i), two offense levels are added because the
                   offense involved 10 or more victims.

               (e) Pursuant to USSG §2B1.1(b)(10), two offense levels are added because a
                   substantial part of the fraudulent scheme was committed from outside the
                   United States and the offense involved sophisticated means and the defendant
                   intentionally engaged in or caused the conduct constituting sophisticated
                   means.

               (f) Pursuant to USSG §2B1.1(b)(11), two offense levels are added because the
                   offense involved the possession or use of an authentication feature, and the
                   unauthorized transfer or use of a means of identification unlawfully to obtain
                   another means of identification, and the possession of five or more means of
                   identification that unlawfully were obtained by the use of another mans of
                   identification.

(g) Pursuant to USSG §3B1.1(b), three levels are added because the defendant was a manager or supervisor of a criminal activity that involved five or more participants.

According, the offense level for Count One is 33.

(3) Count Three

   (a) The guidelines provision applicable is USSG § 2B1.1.

   (b) Pursuant to USSG §2B1.1(a)(1), the base offense level is seven.

   (c) Pursuant to USSG §2B1.1(a)(1)(J), the offense level is increased by 18 levels, because the loss was more than $3,500,000, but less than $9,500,000.

   (d) Pursuant to USSG §2B1.1(b)(2)(A)(i), two offense levels are added because the offense involved 10 or more victims.

   (e) Pursuant to USSG §2B1.1(b)(10), two offense levels are added because a substantial part of the fraudulent scheme was committed from outside the United States and the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means.

   (f) Pursuant to USSG §2B1.1(b)(11), two offense levels are added because the offense involved the possession or use of an authentication feature, and the unauthorized transfer or use of a means of identification unlawfully to obtain another means of identification, and the possession of five or more means of identification that unlawfully were obtained by the use of another mans of identification.

   (g) Pursuant to USSG §3B1.1(b), three levels are added because the defendant was a manager or supervisor of a criminal activity that involved five or more participants.

According, the offense level for Count Three is 34.

(4) Count Four

   (a) The guidelines provisions applicable to Count Four is USSG §2B1.6.

   (b) Pursuant to USSG § 2B1.6(a), the guidelines sentence is the mandatory minimum term of 24 months' imprisonment, to run consecutively to any other sentence imposed. Chapters Three and Four do not apply to this Count.

(5) Multi-Count Analysis

    (a) Because there are multiple counts of conviction, a grouping analysis under USSG § 3D1.1 is performed. Pursuant to USSG § 3D1.1(b)(2), Count Four is excluded from the grouping analysis because the statute specifies the term of imprisonment to be imposed and requires that term to run consecutive to any other term of imprisonment.

    (b) Pursuant to USSG § 3D1.2(d), Counts One and Three are grouped together (Group One) for purposes of determining the combined offense levels. Pursuant to USSG § 3D1.3(b), because the counts in the Group involve offense of the same general type to which different Guidelines provisions apply, the Guidelines provisions that produce the highest offense level are applied. Accordingly, as set forth above, the offense level applicable to Group One is 34.

    (c) Assuming the defendant clearly demonstrates acceptance of responsibility for the offense, a three-level reduction is warranted pursuant to USSG §3E1.1(a) and USSG §3E1.1(b).

In accordance with the above, the applicable Guidelines offense level is 31.

ii) Criminal History Category

    (a) Based upon the information now available to the U.S. Attorney's Office, including representations by the defense, the defendant has zero criminal history points, thus, placing him in Criminal History Category I.

iii) Sentencing Range

    (a) Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 108 to 135 months' imprisonment with a mandatory term of imprisonment of 24 months' on Count Four, which must run consecutively to any other sentence imposed. Accordingly, the defendant's stipulated Guidelines range is 132 to 159 months. imprisonment. In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to §5E1.2. At Guidelines level 31, the applicable fine range is $30,000 to $300,000.

**Adjustment to Incarceration**

9.     According to information maintained by the BOP in a Sentry Report, there are no known infractions to date. While in custody, he has participated in the following programs: Eat Smart, Health Journal, Leadership and Influence, Basic Bookkeeping, and Quarantine U.S. History.

**The Offense Conduct**

10.  The following information was obtained from an investigation conducted by a Special Agent with the Federal Bureau of Investigation (FBI) and includes a review of the charging instruments provided by the U.S. Attorney's Office in the Southern District of New York.

11.  AVIRAM AZARI was the principal owner of an Israeli private intelligence company described alternatively as the "Aviram Hawk" or "Aviram Netz" firm. In furtherance of his efforts to gather intelligence on behalf of his clients, AZARI employed the services of multiple different hacking groups, the most prolific of which is a particular group of individuals based in India (the "Hacking Group").

12.  Since at least approximately November 2014, AZARI communicated with the leaders of the Hacking Group regarding targets his clients were interested in and the various spear phishing campaigns wherein for example, they would send emails ostensibly from a known or trusted sender in order to induce targeted individuals to reveal confidential information. AZARI and the Hacking Group referred to each campaign as "Projects," and they discussed the specific individuals that the Hacking Group hackers should target with their spear phishing campaign for each Project.

13.  Correspondence and spreadsheets that tracked progress on the Projects showed that the groups of victims for each Project appeared to be related. For instance, individual Projects included victims who were:

    (1) all members or affiliates of nonprofit organizations which worked on climate change advocacy issues, including individuals based in the Southern District of New York;

    (2) employees or affiliates of hedge funds, including hedge funds based in the Southern District of New York, that appeared to all have taken short positions in a particular German-based payment processing company;

    (3) employees of the Bahama's gaming authority;

    (4) members of a Mexican political party; and

    (5) governmental officials from various African countries.

14.  The Hacking Group leaders would then task various specific hackers in the Hacking Group to work on these Projects. Among other things, the Hacking Group leaders would provide to the hackers with:

    (1) information on the "Main" targets for each Project (including but not limited to their names, their online accounts, and their phone numbers);

    (2) information on the "Surrounding" targets, or individuals who were related to or "surround" the main targets, such as the main target's family, friends, or co-workers; and

(3) online infrastructure (such as servers and particular spear phishing emails) to execute their spear phishing campaign. In certain instances, the Hacking Group members would conduct Google searches for the targets and their locations and occupations in furtherance of the Projects, and also would use social media accounts, including Google+ and Facebook accounts, to befriend and conduct reconnaissance on the victims. The Hacking Group had a set of accounts that the hackers used in furtherance of their hacking and to communicate with one another and with the Hacking Group leaders.

15.    The Hacking Group hackers would then send the Hacking Group leaders updates as to progress made on the individual Projects, including issues that arose in attempting to infiltrate the accounts, and/or additional information or resources they needed to successfully hack the accounts at issue. Generally, in instances in which an account was successfully hacked, a hacker would send an email to the Hacking Group leaders with the phrase "Success Report" and the name of the Project and the name of the individual target. The email included details evidencing the successful intrusion, including data regarding the type of account and username and password for the target, and screenshots showing the inbox or landing page of the compromised account. In certain instances, the screenshots depicted specific searches within the compromised account for communications between the hacked account and other specific email accounts. The hackers also sometimes sent a link to a specific file on a file transfer protocol (FTP) server that appeared to have contained the contents of a target's account that was successfully compromised.

16.    The Government confirmed at least 23 victims through Hacking Group "Success Reports." For example, the Success Reports contained the usernames and passwords of various electronic accounts used by the victims, such as a webmail account for a victim's place of employment at a hedge fund, personal Gmail accounts, Twitter accounts, LinkedIn accounts, Dropbox accounts, and iCloud accounts, as well as screenshots to evidence that the hackers had successfully infiltrated the accounts. In furtherance of certain of these hacks, the Hacking Group hackers identified specifically that they had used a VPN service which offered IP addresses located in New York City, likely to make sure that their efforts to log into the accounts were not flagged as suspicious due to the location of the server they were using. The Government also identified more than approximately 150 additional hacking targets that the Hacking Group targeted at AZARI's direction.

17.    AZARI processed payments for the spear phishing campaign through a company named Nerosia Ltd., based in Limassol, Cyrus, of which he was listed as the director. Between 2016 and 2019, Nerosia Ltd. generated approximately $4,844,968 in revenue from clients who paid AZARI for his intelligence-gathering efforts, which included the spear phishing campaign described above. AZARI in turn paid the Hacking Group using funds in his Nerosia Ltd. account.

**Arrest and Role Summary**

18.   In summary, from at least November 2014 through 2019, AZARI participated in a
      computer hacking conspiracy wherein he and others victimized at least 23 individuals and
      stole login credentials and information from these victims. Clients paid AZARI $4,844,968
      for his intelligence gathering efforts and spear phishing campaigns as detailed in the above
      paragraphs. AZARI then used this money to pay the hackers whom he employed to gather
      the information. The majority of the criminal activity took place while AZARI was in
      Israel, and involved sophisticated means. AZARI's role in the offense was akin to that of
      a manager as he directed over five co-conspirators to hack into companies.

19.   On the morning of September 29, 2019, AZARI was arrested shortly after flying from Tel
      Aviv to John F. Kennedy International Airport with his family, who intended to board a
      connecting flight. Upon reaching customs, AZARI was separated from his family for a
      secondary check by officers with the Customs and Border Patrol, whereupon AZARI was
      arrested by the FBI.

**Victim Impact**

20.   The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18
      offense. There were at least 23 victims in this case, and the Government is working on
      determining the restitution owed to each victim.

**Adjustment for Obstruction of Justice**

21.   The probation officer has no information indicating the defendant impeded or obstructed
      justice.

**Adjustment for Acceptance of Responsibility**

22.   The defendant was interviewed by the probation officer and upon advice of defense
      counsel, chose not to discuss his involvement in the instant offense. He pled guilty to his
      conduct, and at the plea hearing, he made the following admission:

            In the period between November 2014 and in and including 2019, I, together
            with others, managed an investigation firm in Israel. One of the services that
            we provided to our customers was hacking into electronic email accounts.
            In order to provide this service, we connected with a company that is located
            in India that specializes in this, and this company, in accordance with our
            request, attempted to, and in certain instances even succeeded, to enter -- to
            hack into email addresses of private individuals or companies, all this in
            accordance with the customer's request. Some of the details -- some of the
            private individuals and the companies are located in the Southern District
            of New York and in other places. I was aware that the Indian company
            obtained private data of the account holders, such as the username and
            password…. And even used them as in phishing, and did so by sending
            emails, phishing emails, which was able to obtain private data when the link
            was pressed. The person pressed on the link; that data came up. The

customers paid me for the services that we provided, including hacking the emails, and I in turn paid the Indian company. I'm aware that the value of the hacking into the email accounts was over $5,000.

**Offense Level Computation**

23. The 2021 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

24. Counts 1 and 3 are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior. USSG §3D1.2(d). Pursuant to §3D1.2, the guideline for the count that produces the highest offense level is utilized which in this case is Count 3.

25. Count 4 is excluded from the grouping analysis because the statute specifies the term of imprisonment to be imposed and requires that term to run consecutive to any other term of imprisonment.

**Count 4: Aggravated Identity Theft**

26. The guideline for a violation of 18 U.S.C. § 1028A(a)(1) is USSG §2B1.6. The guideline sentence is the term of imprisonment required by statute, which is at least 2 years' custody to be served consecutive to all other counts. Chapters Three (Adjustments) and Four (Criminal History and Criminal Livelihood) shall not apply to this count of conviction.

**Count Group 1: Conspiracy to Commit Computer Hacking/Wire Fraud (Counts 1 and 3)**

27. **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 1343 is USSG §2B1.1. The base offense level is 7 because the count of conviction has a statutory maximum custodial sentence over 20 years. 2B1.1(a)(1).                                    **7**

28. **Specific Offense Characteristics:** The total funds received by the defendant was $4,844,968. Pursuant to USSG § 2B1.1(b)(1)(J), since the loss exceeded $3,500,000 but was less than $9,500,000, increase by 18 levels.                    **+18**

29. **Specific Offense Characteristics:** Pursuant to USSG § 2B1.1(b)(2)(A)(i), since the offense involved 10 or more victims, increase by 2 levels.                          **+2**

30. **Specific Offense Characteristics:** Pursuant to USSG §§2B1.1(b)(10)(B) and (C), because a substantial part of the scheme was committed from outside of the United States and because the offense involved sophisticated means, increase by two levels.                                                                                              **+2**

Azari, Aviram                    11                    P6536453 - Spitalieri, Jill

31.    **Victim Related Adjustment:** None.                                                    **0**

32.    **Adjustment for Role in the Offense:** The defendant was a manager or supervisor
       (but not an organizer or leader) and the criminal activity involved five or more
       participants or was otherwise extensive; therefore, three levels are added. USSG
       §3B1.1(b).                                                                              **+3**

33.    **Adjustment for Obstruction of Justice:** None.                                        **0**

34.    **Adjusted Offense Level (Subtotal):**                                                  **32**

35.    **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance
       of responsibility for the offense. Accordingly, the offense level is decreased by two
       levels. USSG §3E1.1(a).                                                                 **-2**

36.    **Acceptance of Responsibility:** The defendant has assisted authorities in the
       investigation or prosecution of the defendant's own misconduct by timely notifying
       authorities of the intention to enter a plea of guilty. Accordingly, the offense level
       is decreased by one additional level. USSG §3E1.1(b).                                   **-1**

37.    **Total Offense Level:**                                                                **29**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

38.    None.

### Adult Criminal Conviction(s)

| Date of Arrest | Conviction/Court | Date Sentence Imposed/Disposition | Guideline | Pts |
|---|---|---|---|---|
| 39. 01/01/2002 (Age 30) | Unknown Charge/ Israel | Disciplined without jail time | 4A1.2(h) | 0 |

This incident did not appear on the defendant's rap sheet, and no further information could
be obtained. The defendant voluntarily disclosed this conviction during his presentence
interview. According to the defendant, he was convicted in Israel of illegally providing a
photograph that did not belong to him on behalf of a client in connection with his work.
Defense counsel indicated that the defendant did not go to jail for this offense but was
"disciplined." Defense counsel noted that would do more research on the conviction and
provide the probation office with any updated information that is found.

### Criminal History Computation

40.    The criminal conviction above result in a subtotal criminal history score of zero.

41.    The total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

### Other Criminal Conduct

42.    None.

### Pending Charges

43.    None.

### Other Arrests

44.    None.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

45.    The presentence interview was conducted via telephone with the defendant at the MDC on May 27, 2022, and defense counsel along with a Court-certified Hebrew interpreter were present. Avarim Azari was reportedly born on August 16, 1971, in Hiafa, Israel, to the union of Arye Azari (age 73) and Pnina Azizi (age 69). The defendant's father and mother reside together in Israel and both enjoy good health. His mother is a homemaker, and his father works for a health fund. The defendant has two sisters: Liha Azari (age 47) and Lotem Azari (age 40). Liha resides in Israel, enjoys good health, and is employed at an insurance agency. Lotem resides in Israel, enjoys good health, and is self-employed selling environmentally friendly pet products.

46.    Azari indicated that he has lived in Israel his entire life and has citizenship in both Israel and Portugal. He was raised in a household free from abuse, never went without basic necessities, and did not endure any traumatic experiences in his childhood. He described his relationship with his parents and sisters as "perfect," and noted they are a "close and strong" family. They are aware of his legal situation, and although they are worried, they have remained supportive of the defendant. Azari noted that he speaks with them through the mail every day, and calls them as much as possible, but that varies depending on whether the prison facility is locked down. According to ICE records, the defendant legally entered the United States on September 29, 2019, and has since paroled into the United States.

47.    Azari has been in a relationship with Maggie Azari (nee Zohar) since 1990, and they married in 1996. Their relationship resulted in the birth of Danielle Azari (age 24), Almog Azari (age 20), and Ariel Azari (age 13). The defendant described his relationship with his wife as "very, very good and very strong," and indicated that she is "extremely worried

about me," and wants him to come home as soon as possible. It has been particularly difficult for her emotionally and financially, but she has received help from family when needed. She resides in Israel with their children and enjoys good health. She was previously a teacher for approximately 30 years, and more recently, she is a school psychologist and educational advisor. Defense counsel indicated that he would provide contact information for the defendant's wife and subsequent requests were made for her information, but no response has been received.

48.   The defendant's children all enjoy good health and reside in Israel. Danielle is employed as an officer in the army, and Almog finished her military service a week ago and is trying to figure out what she will do next. Ariel is doing well as a student. They were present when the defendant was arrested for the instant offense as the family was on their way to a Disney Resort when the defendant was detained by immigration. Azari's wife and children remained in the United States for three days in hopes that the defendant would be released, but when they did not release him Azari's family returned to Israel. Azari indicated that he and his children miss each other "a lot, a lot, a lot, we are very close, they are my everything." He also noted that they have been coping with his absence as best they can and they are "being strong."

49.   In regard to the future, the defendant wants to return to his family in Israel as soon as possible to spend time with them because he misses them "immensely." He noted that missing his only son's Bar Mitzvah was difficult for the defendant as he will never get to experience him reading the Torah for the first time or watch him have that celebration. According to defense counsel, the defendant has learned his lessons because on top of not being able to see his family for the last three years, he has dealt with Covid and being sick while in custody.

### Physical Condition

50.   The defendant stands five feet eleven inches tall and weighs 242 pounds. He has green/blue eyes and brown/grey hair. He does not have any birthmarks, scars, or tattoos.

51.   When he was first arrested for the instant offense in 2019, while in custody,



52.

Medical records were requested

from defense counsel, and a response is awaited. The defendant's Pretrial Services Report dated September 30, 2019, stated that the defendant is in excellent health with no medical problems reported.

### Mental and Emotional Health

53.     Azari has never been treated for a mental or emotional health concern, and he does not believe such treatment is needed. He copes with stress and being away from his family by speaking with them as often as possible, reading books, and doing puzzles.

### Substance Abuse

54.     Azari denied ever trying any controlled substances or alcohol.

### Educational, Vocational and Special Skills

55.     The defendant graduated from the Military School of the Navy in Israel in 1989, at which point, he immediately began his mandatory military service. During school, he reported that he earned "average grades," and never had any disciplinary issues. This information could not be verified.

56.     Between 1989 and 1992, he was in the Israel Army as an air born soldier where he received firearms and weapons training. He described being in a specialized unit, and indicated that after he completed his service, he was in the reserves until he was 40 years old. During his military tour, he indicated that he was on the "front line," and witnessed combat. He unfortunately lost several friends while experiencing combat during the Lebanon War in 2006 while he was a reservist. This information could not be verified.

57.     Azari is fluent in the Hebrew language and has an above average and conversational understanding of English.

### Employment Record

58.     Since 1996, the defendant has been self-employed and the owner of Aviram Hawk, which is a private intelligence agency in Netanya, Israel. The defendant indicated this company has closed due to his incarceration. Upon advice of defense counsel, since this prior employment is part of the instant offense, no further questions were asked pertaining to this work. This information could not be verified.

### Financial Condition: Ability to Pay

59.     Upon advice of defense counsel, the defendant opted to complete a financial affidavit and cash flow statement after the presentence interview with his attorney's assistance; however, no documentation has been received.

60.     As the IRS no longer honors third party requests for tax records, tax information was not requested.

61.    A credit inquiry could not be requested as the defendant does not have a Social Security Number.

62.    Pursuant to USSG §5E1.2(a), the court shall impose a fine in all cases, except where the defendant establishes that she is unable to pay and is not likely to become able to pay any fine.  As the defendant has not provided financial documentation, she has not demonstrated an inability to pay a fine.

## PART D. SENTENCING OPTIONS

### Custody

63.    **Statutory Provisions:** Count 1: The maximum term of imprisonment is five years. 18 U.S.C. § 371. Count 3: The maximum term of imprisonment is 20 years. 18 U.S.C. § 1343. Count 4: The minimum term of imprisonment is two years. 18 U.S.C. § 1028A(a)(1).

64.    The term of imprisonment on Count 4 (24 months) must be imposed consecutively to any other counts.

65.    **Guideline Provisions:** Based upon a total offense level of 29 and a criminal history category of I, the guideline imprisonment range is 87 months to 108 months.

### Impact of Plea Agreement

66.    Pursuant to §2B1.6 Application Note#2, a two-level increase under §2B1.1(b)(11) is inapplicable.  As such, Probation's total offense level is 29.

67.    The fine range is $30,000 to $9,689,936 (twice the gross pecuniary gain).

### Supervised Release

68.    **Statutory Provisions:** Counts 1 and 3: The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2). Count 4: The Court may impose a term of supervised release of not more than one year. 18 U.S.C. § 3583(b)(3).

69.    Multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e).

70.    **Guideline Provisions:** Count 1: Since the offense is a Class D Felony, the guideline range for a term of supervised release is 1 year to 3 years. USSG §5D1.2(a)(2). Count 3: Since the offense is a Class C Felony, the guideline range for a term of supervised release is 1 year to 3 years. USSG §5D1.2(a)(2). Count 4: Since the offense is a Class E Felony, the guideline range for a term of supervised release is one year. USSG §5D1.2(a)(3).

### Probation

71.    **Statutory Provisions:**  Counts 1 & 3: the defendant is ineligible for probation as he is being sentenced at the same time to a term of imprisonment for the same offense. 18 U.S.C.

Azari, Aviram                              16                        P6536453 - Spitalieri, Jill

§3561(a)(1). Count 4: The defendant is ineligible for probation because it is expressly precluded by statute. 18 U.S.C. § 3561(a)(2).

72.  Multiple terms of probation shall run concurrently. 18 U.S.C. § 3564(b).

73.  **Guideline Provisions:** Counts 1, 3, and 4: The defendant is ineligible for probation because probation has been expressly precluded by statute. USSG §5B1.1(b)(2).

**Fines**

74.  **Statutory Provisions:** Counts 1, 3, and 4: The maximum fine is $250,000 or twice the gross loss/pecuniary gain. 18 U.S.C. § 3571(b).

75.  Counts 1, 3, and 4: A special assessment of $300 is mandatory. 18 U.S.C. § 3013.

76.  **Guideline Provisions:** The fine range for this offense is from $30,000 to $9,689,936. USSG §5E1.2(c)(3).

77.  Costs of prosecution shall be imposed on the defendant as required by statute. USSG §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated August 27, 2021, provides the following monthly cost data:

|          | **Bureau of Prisons Facilities** | **Community Correction Centers** | **Supervision by Probation Officer** |
|----------|----------------------------------|----------------------------------|--------------------------------------|
| Daily    | $121.00                          | $98.00                           | $12.00                               |
| Monthly  | $3,688.00                        | $2,980.00                        | $371.00                              |
| Annually | $44,258.00                       | $35,761.00                       | $4,454.00                            |

**Restitution**

78.  **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, the restitution amount and victim information is pending from the Government.

79.  **Guideline Provisions:** Restitution shall be ordered. USSG §5E1.1.

**Denial of Federal Benefits**

80.  **Statutory Provisions:** None.

81.  **Guideline Provisions:** None.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

82. The probation officer has not identified any factors that would warrant a departure from the applicable sentencing guideline range.

## PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE ADVISORY GUIDELINE SYSTEM

83. Presentation of information in this section does not necessarily constitute a recommendation by the Probation Office. Pursuant to 18 U.S.C. §3553(a), the Court may consider a sentence outside of the Guidelines Range based upon certain factors including the personal history and circumstances of the defendant.

84. Probation may recommend a sentence below the advisory guideline range based upon the following 18 USC 3553(a) factor(s):

        (a) The defendant is struggling with an undiagnosed, untreated, and painful gastrointestinal problem.

Respectfully Submitted,

Michael J. Fitzpatrick
Chief U.S. Probation Officer

By:    Jill Spitalieri
        USPO

Approved:

James S. Mullen
SUSPO

Azari, Aviram                          18                        P6536453 - Spitalieri, Jill

## ADDENDUM TO THE PRESENTENCE REPORT

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK
### UNITED STATES V. AVIRAM AZARI, DKT. 0208 1:19CR00610-001

### OBJECTIONS

#### By the Government

To date, the Government has not provided any objections to the presentence report.

#### By the Defendant

To date, defense counsel has not provided any objections to the presentence report.

#### Revisions by U.S. Probation Officer

Paragraph 23 was revised to state that the 2021 Guidelines Manual is the operative manual.

Additional medical information was provided in paragraph 52.

Respectfully Submitted,

Edwin Rodriguez
Acting Chief U.S. Probation Officer

*Jill Furr Spitsl*

By:     Jill  Spitalieri
        USPO

Approved:

James S. Mullen
SUSPO

Azari, Aviram                    19                    P6536453 - Spitalieri, Jill

## SENTENCING RECOMMENDATION

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK
### UNITED STATES V. AVIRAM  AZARI, DKT. 0208 1:19CR00610-001

**TOTAL OFFENSE LEVEL**                    29
**CRIMINAL HISTORY CATEGORY**              I

|                              | **Statutory Provisions** | **Guideline Provisions** | **Recommended Sentence** |
|------------------------------|--------------------------|--------------------------|--------------------------|
| **CUSTODY:**                 | Ct. 1: up to 5 years<br>Ct. 3: Up to 20 years<br>Ct. 4: 2 years, consecutive to all other Counts | Cts. 1, 3: 87 months-108 months<br>Ct. 4: 2 years, consecutive to all other Counts | 111 months total (downward variance)<br>Ct. 1: 60 months<br>Ct. 3: 87 months,<br>Cts. 1 and 3 to run concurrently<br>Ct. 4: 24 months, consecutive to Cts. 1 and 3 |
| **SUPERVISED RELEASE:**      | Cts. 1, 3: Up to 3 years<br>Ct. 4: 1 year | Cts. 1, 3: 1 year-3 years<br>Ct. 4: 1 year | Total Term: 3 years<br>Cts. 1 and 3: 3 years<br>Ct. 4: 1 year<br>All counts to run concurrent |
| **PROBATION:**               | Cts. 1, 3, 4: 1 year-5 years | Ineligible | None |
| **FINE:**                    | Cts. 1, 3, 4: Up to $250,000 per count | $30,000-$9,689,936 | Not recommended |
| **RESTITUTION:**             | To be determined | To be determined | To be determined |

Azari, Aviram                                   20                              P6536453 - Spitalieri, Jill

**SPECIAL**           $300                  $300                  $300
**ASSESSMENT:**

## Justification

Aviram Azari stands before the Court for sentencing after pleading guilty to Conspiracy to Commit Computer Hacking, Wire Fraud, and Aggravated Identity Theft. In summary, Azari participated in a computer hacking conspiracy wherein he and others victimized at least 23 individuals and stole login credentials and information from these victims. Clients paid him $4,844,968 for his intelligence gathering efforts and spear phishing campaigns, which he used to pay the hackers whom he employed. He has one prior foreign criminal conviction in Israel, no criminal history points, and is represented in Criminal History Category I.

Azari was born and raised in Israel in a household free from abuse, never went without basic necessities, and did not suffer any traumatic experiences. He maintains a close relationship with his parents and siblings, and they have remained supportive of him throughout his legal situation. He was in the Israeli military during his 20s, and then in the reserves until he was 40 years old. During his military tour, he indicated that he was on the "front line," witnessed combat, and lost several friends during war. He is married with two children, and his absence from their lives has proven difficult emotionally and financially. In regard to the future, the defendant is focused on reuniting with his family in Israel as soon as possible. Reportedly, while in custody, the defendant began suffering from a painful and undiagnosed gastrointestinal issue that causes him to constantly burp. He disclaimed any mental or emotional health concerns and denied ever trying any controlled substances or alcohol. The defendant was self-employed as the owner of a private intelligence agency in Israel, but it closed due to the instant offense.

When determining a recommendation, the undersigned could not overlook several aggravating factors in this case, especially, the length of the conspiracy, the number of victims who had their privacy invaded in addition to financial losses, and the defendant's managerial role in the offense. We recognize the possible existence of several mitigating factors; specifically, physical health, family dependency, and his exposure to war                                        However, to date we have not independently been able to corroborate any of this information and as such we gave it no consideration for a variance from the guidelines range. A significant custodial sentence will address the sentencing objectives of just punishment and general deterrence to others who find themselves in similar situations. It will also afford Azari the opportunity to reflect on his past transgressions, impress upon him the seriousness of his criminal actions and serve as a deterrent if he finds himself similarly situated in the future.

Pursuant to 18 USC §§ 3553(a)(2)(A) and (C), the sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and protect the public from further crimes of the defendant. As such, a sentence of 111 months' custody, as reflected in the above sentencing chart, is sufficient but not greater than necessary to achieve the goals of sentencing. A three-year term of supervised release is recommended, as reflected in the sentencing chart above. Should the Court deem a term of supervised release appropriate, we recommend that the defendant be subjected to search conditions as the offense involved fraud and computers and to detect and deter new criminality; financial disclosure and restrictions because of his potential

Azari, Aviram                                21                        P6536453 - Spitalieri, Jill

restitution and forfeiture obligations, and to abide by immigration laws and cooperate with immigration authorities. The defendant must pay the special assessment fee of $300, and restitution is to be determined.

*Pursuant to the Violent Crime Control and Law Enforcement Act of 1994, for offenses committed after September 13, 1994, the court shall require that all offenders on probation, parole, or supervised release submit to one drug test within fifteen days of commencement of probation, parole or supervised release and at least two drug tests thereafter for use of a controlled substance, unless ameliorated or suspended by the court due to its determination that the defendant poses a low risk of future substance abuse as provided in 18 USC 3563 (a) (5) / 3583 (d).*

### Drug Risk Analysis

The Probation Office is not recommending a term of supervised release. If a term of supervised release were imposed, we remark that Azari disclaimed a history of illicit drug use, and the mandatory drug testing condition does not appear warranted.

### Recommendation

We respectfully recommend that Your Honor impose a sentence of 111 months' imprisonment, as reflected in the sentencing chart above. A three-year term of supervised release is recommended, as reflected in the sentencing chart above.

### Mandatory Conditions

If a term of supervised release is imposed, the following conditions are mandatory:

> You must not commit another federal, state, or local crime.

> You must not unlawfully possess a controlled substance.

> You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
> > ☒ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.

> You must cooperate in the collection of DNA, as directed by the probation officer.

> You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Azari, Aviram                              22                      P6536453 - Spitalieri, Jill

**Standard Conditions**

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.  You must answer truthfully the questions asked by your probation officer.

5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

Azari, Aviram                             23                         P6536453 - Spitalieri, Jill

10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12.  You must follow the instructions of the probation officer related to the conditions of supervision.

**Special Conditions**

a)  You must obey the immigration laws and comply with the directives of immigration authorities.

b)  You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

c)  You must provide the probation officer with access to any requested financial information.

d)  You must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

If you are sentenced to any period of supervision, it is recommended that you be supervised by the district of residence.

**Special Assessment**

It is further ordered that you must pay to the United States a special assessment of $300, which shall be due immediately.

**Restitution**

You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664.

Should restitution be sought, the Court may choose to delay issuing an Order of Restitution for up to 90 days after sentence in anticipation of receiving the necessary identifying information from the Government pursuant to the provisions of 18 U.S.C. § 3664(d)(5).

**Payment Instructions**

You shall make restitution payments by certified check, bank check, money order, wire transfer, credit card or cash. Checks and money orders shall be made payable to the "SDNY Clerk of the Court" and mailed or hand-delivered to: United States Courthouse, 500 Pearl Street, New York, New York 10007 - Attention: Cashier, as required by 18 U.S.C. § 3611. You shall write your name and the docket number of this case on each check or money order. Credit card payments must be made in person at the Clerk's Office. Any cash payments shall be hand delivered to the Clerk's Office using exact change and shall not be mailed. For payments by wire, you shall contact the Clerk's Office for wiring instructions.

**Schedule of Payments**

Pursuant to 18 U.S.C. § 3664(f)(2), in consideration of the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; projected earnings and other income of the defendant; and any financial obligations of the defendant; including obligations to dependents, you shall pay restitution in the manner and according to the schedule that follows:

In the interest of justice, restitution shall be payable in installments pursuant to 18 U.S.C. § 3572(d)(1) and (2).

You shall commence monthly installment payments of [not less than $_____ OR in an amount equal to _____ percent of your gross income], payable on the _____ of each month, as specified by the Court: _____.

The factors in 18 U.S.C. § 3664(f)(2) were considered in formulating the payment schedule.

**Joint and Several Liability**

Restitution is not joint and several with other defendants or with others not named herein.

**Payment While Detained**

While serving the term of imprisonment, you shall make installment payments toward your restitution obligation and may do so through the Bureau of Prisons' (BOP) Inmate Financial Responsibility Plan (IFRP). Pursuant to BOP policy, the BOP may establish a payment plan by evaluating your six-month deposit history and subtracting an amount determined by the BOP to be used to maintain contact with family and friends. The remaining balance may be used to determine a repayment schedule. BOP staff shall help you develop a financial plan and shall monitor the inmate's progress in meeting your restitution obligation.

**Additional Provisions**

You shall notify, within 30 days, the Clerk of Court, the United States Probation Office (during any period of probation or supervised release), and the United States Attorney's Office, 86 Chambers Street, 3rd Floor, New York, New York 10007 (Attn: Financial Litigation Unit) of (1) any change of your name, residence, or mailing address or (2) any material change in your financial

resources that affects your ability to pay restitution in accordance with 18 U.S.C. § 3664(k). If you disclose, or the Government otherwise learns of, additional assets not known to the Government at the time of the execution of this order, the Government may seek a Court order modifying the payment schedule consistent with the discovery of new or additional assets.

You shall pay interest on any restitution amount of more than $2,500, unless restitution is paid in full before the 15th day after the date of the judgment, in accordance with 18 U.S.C. § 3612(f)(1).

**Restitution Liability**

Your liability to pay restitution shall terminate on the date that is the later of 20 years from the entry of judgment or 20 years after the Defendant's release from imprisonment, as provided in 18 U.S.C. § 3613(b). Subject to the time limitations in the preceding sentence, in the event of your death, your estate will be held responsible for any unpaid balance of the restitution amount, and any lien filed pursuant to 18 U.S.C. § 3613(c) shall continue until the estate receives a written release of that liability.

**Fines**

We believe that the defendant does not have the ability to pay a fine and recommend that the fine in this case be waived.

**Forfeiture**

Pursuant to Rule 32.2(b)(4)(B), "[t]he court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing. The court must also include the forfeiture order, directly or by reference, in the judgment, but the court's failure to do so may be corrected at any time under Rule 36."

Azari, Aviram                          26                    P6536453 - Spitalieri, Jill

**Voluntary Surrender**

The defendant has been detained without bail since his arrest. He is not a candidate for voluntary surrender because of the provisions found in 18 USC §3143(a)(2).

Respectfully Submitted,

Edwin Rodriguez
Acting Chief U.S. Probation Officer

By:    Jill Spitalieri
       USPO

Approved:

James S. Mullen
SUSPO

# Exhibit O



# UNITED STATES GOVERNMENT
## MEMORANDUM

Metropolitan Correctional Center, New York, New York

**DATE:** July 23, 2021

**FROM:** M. Charles / Food Service Supervisor

**SUBJECT:** AZARI, #87216-054

To whom it may concern:

This is to confirm that Inmate AZARI, #87216-054 has been working in the food service department from August 2018 to present as one of our head preparation cook for 650 inmates. Azari has been assigned the duties of head line server, however he also helps out doing the following: butcher, ovens, dining and dish machine worker, and preparation worker. Inmate Azari is learning how all the positions contribute to the overall success of the department and works directly under my supervision.   He also helps us with sanitation to include cleaning industrial ovens, steam kettles, organizing the warehouse, refrigerators, freezers and oven warmers. Azari has also requested to take the ServSafe certification for the food service department.

During COVID Azari has volunteered to help the department sanitize the kitchen and food carts before they were sent up to the units.

He is very professional at work, an extremely hard worker, and he puts all his efforts to get the job done in the given time. If you have any question please feel free to call me at (646)-836-6404.

Thank you for your time.

M. Charles



# UNITED STATES GOVERNMENT
## MEMORANDUM

Metropolitan Correctional Center, New York, New York

**DATE:**      **July 23, 2021**

**FROM:**      *M. Charles*
               **M. Charles / Food Service Supervisor**

**SUBJECT:**      **AZARI, #87216-054**

To whom it may concern:

This is to confirm that Inmate AZARI, #87216-054 has been working in the food service department from August 2018 to present as one of our head preparation cook for 650 inmates. Azari has been assigned the duties of head line server, however he also helps out doing the following: butcher, ovens, dining and dish machine worker, and preparation worker. Inmate Azari is learning how all the positions contribute to the overall success of the department and works directly under my supervision.   He also helps us with sanitation to include cleaning industrial ovens, steam kettles, organizing the warehouse, refrigerators, freezers and oven warmers. Azari has also requested to take the ServSafe certification for the food service department.

During COVID Azari has volunteered to help the department sanitize the kitchen and food carts before they were sent up to the units.

He is very professional at work, an extremely hard worker, and he puts all his efforts to get the job done in the given time. If you have any question please feel free to call me at (646)-836-6404.

Thank you for your time.

M. Charles

# MDC Brooklyn
# Recreation Department

This is to Certify that

*Avram Azari*

Has Successfully Completed

*EatSmart Sentry Journal*

At MDC Brooklyn

This certificate is hereby issued this 25th day of March , 2022

_D. Fulmore_

*Recreation Specialist*



# MDC Brooklyn
# Recreation Department

*This is to Certify that*

## Avram Azari

*Has Successfully Completed*

*Diabetes and You Sent Op Course*

*This certificate is hereby issued this 17th day of June 2022*

**D. Fulmore**

*Recreation Specialist*